[Civ. No. 5631. Third Appellate District.—October 1, 1936.]

HAROLD LAHEY et al., Respondents, v. SOUTHERN PACIFIC COMPANY (a Corporation) et al., Appellants.

Devlin & Devlin & Diepenbrock and Horace B. Wulff for Appellants.

Clifford A. Russell, A. M. Mull, Jr., and Henry & Bedeau for Respondents.

PLUMMER, J.—Three appeals in this action are presented by the appellants upon one transcript and argued as one cause. The action was begun by the plaintiffs as the heirs and dependents of Henry F. Lahey, deceased, to recover damages by reason of his death suffered in a collision between an automobile driven by him and a train operated by the Southern Pacific Company, a corporation. The collision occurred at a point where a certain highway known as the "Power Line Highway" crosses the Southern Pacific railway track in the county of Sacramento, a few miles south of the town of Brighton. The line of the Southern Pacific Company runs northerly and southerly, and the Power Line highway runs northeasterly and southwesterly. The highway and the line of the Southern Pacific Company intersect at a point called the "Power Line Crossing." The highway and the railroad line intersect in such a manner as to conform practically to the letter "X", so that one driving an automobile along the highway and over the Power Line crossing is within a danger zone for a period somewhat longer than in instances where the highway crosses the railroad line at right angles.

As we said, the collision occurred at the point called the "Power Line Crossing", on the morning of the 28th of January, 1935. All the testimony in the record shows that the morning referred to was very foggy and visibility was very much limited.

The plaintiffs had judgment for $40,000, which was reduced by the trial judge to the sum of $25,000. Upon this appeal the appellants present six grounds for reversal:

1. That the deceased was guilty of contributory negligence as a matter of law in driving his automobile immediately in front of the train, when he had a vision of 270 feet through the fog, and could have seen the train at any time after he reached a point more than 100 feet from the crossing. (We may here state that the record discloses an abundance of testimony to warrant the jury in concluding that this alleged ground of reversal is not supported by the facts of the case);

2. That the court erred in submitting to the jury the question of alleged negligence on the part of the defendants in failing to give the signals required by law;

3. That the court erred in instructing the jury that the law presumes the decedent exercised due care, etc., for his own safety;

4. That the court erred in instructing the jury that the deceased had a right to assume that 'the operators of the engine would give the required warning signals;

5. That the court erred in instructing the jury that its verdict must be for the plaintiffs if they found that the defendant failed to give the required signals, when the complaint charged negligence in operating the train at an excessive rate of speed, etc.;

6. That the verdict as reduced by the trial court is excessive.

In addition to what we have said of the physical conditions surrounding the scene of the collision, we may state that the railroad track is built upon a fill approximately six feet higher than the level of the highway, and the highway grade, crossing the railroad begins at a point about 200 feet distant from the crossing. Adjacent to the highway are the usual signs indicating the presence of a railroad crossing, one of which signs was a disc with a white background and black cross with letters "RR" thereon. A similar sign is on each side of the railroad crossing, each distant from the railroad 430 feet.

On the morning of January 28, 1935, a number of men, constituting a crew of SERA workers, had reported for work at a place on the west side of the right-of-way of the Southern Pacific Company at a point about 1800 feet north of the crossing. The workers were being transferred from the project just mentioned to a project south of what is called the Davies road. A group of workers, including Lahey, left the place of meeting and drove in their respective automobiles to certain streets, and finally turned into the Power Line road and stopped in the vicinity of a brick plant which is a short distance from the Power Line crossing. There they looked about for additional men, and not finding them, went back to their cars and proceeded southerly from that point a distance of about 1200 feet to the crossing. There is some uncertainty as to the number of cars in the caravan, appellants claiming that there were seven cars in the caravan, the respondents, that there were not so many. It appears, however, that the lead car was

a brick truck driven by a man by the name of Waters, who appears to have had no connection with the SERA crew of employees. The appellants' statement is that the car driven by Waters was followed by one driven by a man by the name of Moore. This car was followed in turn by one driven by Abshire. Abshire's car was followed by a car driven by a Mr. Murphy, in which a man by the name of Pritchard was riding. Following Murphy's car was a car driven by Lahey. Two cars were following the Lahey car, one driven by a man by the name of Asta, with whom a man by the name of Coray was riding. Another car following was alleged to have been driven by a witness by the name of Blanos. The testimony in the record given by Blanos is of such a nature that the jury was warranted in concluding that Blanos was not just where he said he was on the morning of January 28, 1935, at the time of the collision. He testified to the effect that Lahey, a short distance from the crossing, passed him, driving some twenty-five miles an hour, and that he watched Lahey's car until the rear light faded from view. He, however, failed to testify as to the presence of other cars, and as to the presence of cars which would intervene between his car and the one driven by Lahey, and also, that no other cars in the caravan had passed him. The trial court and the jury evidently gave little heed to the testimony of Blanos by reason of the discrepancies which we have mentioned.

On a clear morning the crossing in question affords an unobstructed view for over a mile in the direction from which the train was proceeding. The fog, however, obstructed vision to such an extent that the approach of the train was visible only from a limited distance. There is considerable diversity in the testimony as to the distance the train could be seen on the morning of the collision. Practically all of the distances testified to were mere estimates. It also appears that the density of the fog varied, so that from different places and different times, the distance of visibility likewise varied.

The trial court, in denying one of the appellants' motions, stated that there was testimony in the case from which the jury could conclude that the distance of visibility available to Lahey at the time of the collision was not over 100 feet.

The testimony of the engineer is to the effect that some 1500 feet from the crossing he had shut off steam down to what is called a "drifting" condition, and also had gently applied the brakes in order to lessen the speed of the train, in anticipation of a stop to be made some distance north of the point of the collision. His testimony and that of his fireman is to the effect that the bell was continuously ringing, and that the whistle was being sounded. We may here call attention to the fact that the approaching caravan of cars was made on the Power Line highway in such a direction by reason of the acute angle of the crossing, that the headlights of the respective cars were facing the oncoming train. These headlights were on the easterly side of the track, and, therefore, on the side of the engine occupied by the engineer. The engineer testified, however, that he did not see any of these lights, and that he did not see the Power Line crossing until his engine was immediately on the same, and that he did not know his engine had collided with the car driven by Lahey until his fireman called "hold her". The engineer also testified that the fog banked his headlight so that he could not see more than from 75 to 150 feet. The question and answer relating to this point is as follows: "Mr. Negrich—Q. How close do you have to be to an object on the track, on a morning such as that morning, before you can see the object? A. Well, I probably might have seen 100 feet, might have seen 150 feet, might have seen 75 feet. Q. Did you see the Power Line Crossing? A. No, sir. Q. You did not see the Power Line Crossing until after your locomotive had gone by the cars? A. As I was going by it." According to the record, the estimated speed of the engine as it passed over the crossing was between 30 and 35 miles per hour. The witness Waters, driving the truck which we have mentioned preceding the caravan, testified that the morning was very foggy; that he noticed that none of the automobile drivers had passed him; that he was driving in the neighborhood of 20 miles an hour; that when he was in the neighborhood of about 30 to 50 feet south of the crossing he first noticed the train; that he saw the light of the train; that the train was distant about 100 or 150 feet from him when he first noticed it; that he kept on going and finally stopped; that he stopped at a distance between 200 and 250 feet from

the crossing; that he was driving a two and one-half ton truck; that he did not hear any signals; that his hearing was not very acute.

The testimony of Waters shows that he was across the railroad track and driving down approximately along the side of the track before he noticed the approach of the train. We quote from the testimony of the witness Clarence A. Moore, who was driving the car immediately following the truck, to wit: "I heard the crash between the train and Lahey's car, and at that time I was about 50 feet, approximately, from the crossing. There was one car behind me that I know of; it was Abshire's. I saw the train when I was practically on the tracks, or just over the tracks; it was about 100 feet away. I saw the outline of the engine and the headlight at the same time. I could not see the headlight much further than you could see the outline of the engine. There was a heavy fog; you could see about 100 feet in that fog at the particular time of the crash. I was going up on the incline right on the tracks before I realized that I was approaching a railroad crossing about 15 or 20 feet away. At that time I looked to see whether or not I could see a train, and could not, and did not hear any noise." On cross-examination this witness testified: "Q. About how far from the cattle-guard? A. Well, less than 100 feet. Q. Can you give us any better idea than that, between 50 and 100 feet? A. No, I would not say that close to it. Q. Close to 100 feet behind the cattle-guard? A. The distance, from my view of it, it looked about 100 feet from the cattle-guard. Q. That is south of the cattle-guard? A. Now of course it is very foggy, yes sir. Q. It was hard to estimate distances, was it not? A. Yes, sir. Q. It may have been further or it may have been closer? A. Yes, sir."

The witness Abshire testified as follows: "I was maybe 75, 80, 90 or 60 feet, something like that, from the crossing at the time the crash occurred. The nature of the weather condition out there at the time of the crash was very foggy. I presume I could see maybe 100 feet, something like that. I think I was right on the track, just up crossing on the crossing when I first saw the train; it seemed to be just entering the cattle-guard, however far that may be. I had gone maybe 50 or 60 feet, something like that, before I

heard the crash. I was 25 to 30 feet behind Mr. Moore's car that was ahead of me."

The witness Murphy testified as follows: "I do not recall any cars ahead of me. I do not know the position of the other cars or how close they were to me. I was traveling 15 or 20 miles an hour along the road. The weather was pretty foggy. There were times when I could not see very far, and there were other times when you might see 10 rods. There were times when you could not see 50 feet, hardly. I was coming close to the crossing; I knew I was going onto a railroad track; that was just as I got to the raise, or pretty close to the raise; there is a little sign there; it is about 30, 40 or 50 feet from the railroad track. When I first saw the train I was up on the tracks. When I first saw the train I saw a light to the left as I looked out of the window, kind of like a red ball. It looked like about 30 feet, I imagine 40 feet away, something like that. After the crash I stopped, perhaps, 75 or 100 feet somewhere along there." This witness further testified that he did not look back; that it was a damp fog; that he had the head-lights lit; that he saw the sign as he was going up on the railroad track; from there on he looked and listened for an approaching train, but heard no bell nor whistle; that the window was out on the left-hand side of his car, which was the side on which the train was approaching; that he slowed down just as he came to the raise before going onto the railroad track. The purpose of that was just a precautionary measure.

Glenn Pritchard, a witness for the plaintiffs, testified that he was riding with Murphy; that the Lahey car followed Murphy; that a car driven by a Mr. Asta was behind Lahey, and that Santino's car was behind Asta's; that they were driving possibly about 10 or 12 miles an hour; that the lights of Lahey's car were lit; that they almost stopped at the culvert; that the windows of the car were down; that after passing the culvert they kept going at a slow rate of speed; that he saw the locomotive and light when they were on the track, or 4 or 5 feet past the center. "I knew that we were going onto the railroad track, and when I looked toward Murphy to say something, I saw the locomotive headlight; we could not have been more than 4 or 5 feet past the center." That the first time he saw the train

it was right on them; he judged that it was about 75 feet away; that when he saw the train he just said, "the train"; that Murphy stepped on the gas; that he looked back through the rear window and saw Mr. Lahey's headlights going up like a beacon; Lahey's car must have been traveling about 20 feet behind Murphy's car; that it was real foggy; possibly in places you could see 30 or 35 feet; that headlights could be seen probably 40 or 50 feet; that you could not see a man over 35 or 40 feet away.

Jasper Asta (a Mexican), testified as follows: "Lahey was ahead of me 200 or 300 feet, something like that; hardly can see; and all at once I see him way up in the track; and all at once I see the machine, the engine coming, you know, and all of a sudden, in a few seconds I see altogether, and then I heard the crash, and then everything was done; I can see the shadow of the machine, and I can see the shadow of the engine; I see the shadow coming both together at once; I was around 200 or 300 feet away; I was traveling 10 to 15 miles an hour in my truck. Q. Where was the train when you first saw it? A. It was on the railroad track. Q. How far from the crossing? A. Well, I cannot say; I saw the shadow; it looked like all coming together; I did not see the train very far from the engine. Q. At the time it hit? A. I never see; very few seconds they went together; that is all I can say."

Manual Coray (also a Mexican), testified that he was riding with Asta in a Ford truck; that they were about 100 feet behind Lahey; that he saw the crash when he heard the noise when it hit, and could see the shadow of the engine; that it was pretty foggy; that you could not see 50 feet ahead in some places, and in some places you could see pretty good; that all the gang had lights lit. The record further shows that Asta stopped his car at the time of the crash, and the measured distance from the crossing was testified to by the conductor of the train as being 280 feet.

Our attention has not been called to, and we have not found in the record any testimony as to the conduct of Lahey just preceding his approach to the railroad crossing. Whether he did or did not take any precautionary measures is absolutely undisclosed. The question of visibility, as shown by the testimony, we think amply supports the statement of the trial court as to the conclusion on that

question which might properly be drawn by the jury, to-wit: that visibility did not exceed over 100 feet.

The appellants' argument is that Lahey blindly followed the immediately preceding car, without exercising any precautionary measures to insure his own safety. This, of course, is simply argument, and a conclusion at which the jury might have arrived, but the result discloses that this view was not accepted by the jury.

As to whether signals were given of the approaching engine, there was much negative testimony given by witnesses who heard the crash. Six witnesses, who were somewhat in excess of 1800 feet away, heard no signals, no bell nor whistle, but did hear the crash. Of the drivers of the caravan, two testified that they heard whistle signals practically at the time of the collision. Others testified that they heard no whistles or bell signals. One witness testified that he did not hear the crash. The fact that the witnesses were in close enough proximity to hear the crash, we think justified the conclusion of the jury that if a whistle had been blown or a bell rung, they would have heard such signals.

An examination of the testimony of the witness Blanos, for the defendant, shows that the whistle which he testified to having heard, was blown at the instant of the crash. The record does show that very shortly after the crash, signals were blown to give warning of the backing up of the train, and also to send out the rear flagman.

The negative testimony or testimony of witnesses that they did not hear the ringing of a bell or the sounding of a whistle is admissible and sufficient to support a verdict of the jury as to the nongiving of signals. We need only to cite the following cases without quoting therefrom: *Jones* v. *Southern Pacific Ry. Co.*, 74 Cal. App. 10 [239 Pac. 429]; *Switzler* v. *Atchison, T. & S. F. Ry. Co.*, 104 Cal. App. 138 [285 Pac. 918]. The drivers of the cars in the caravan to which we have referred are shown by the transcript to have been sufficiently near to justify the conclusion of the jury that they were in a position to hear warning signals, if any had been given, and also that the testimony of the witnesses who heard the crash were sufficiently near to have heard warning signals, if any had been given.

■ Based upon the testimony which we have summarized, the appellant challenges the correctness of two instructions given by the court to the jury, the first one of which reads as follows:

"It is a presumption of law that a person takes ordinary care of his own concerns, and as applied to this case, this presumption means that it is to be presumed, in the absence of evidence to the contrary, that Henry Lahey did everything that a reasonable and prudent man could have done under the same circumstances for the protection of his own safety, and the burden of pleading negligence on the part of Henry F. Lahey is upon the defendants, and that unless the presumption I have referred to is overcome by satisfactory evidence, you will find for the plaintiffs upon the issue of contributory negligence."

The second challenged instruction reads as follows:

"A person in the exercise of ordinary care and caution, himself, in approaching a railroad track, has a right to anticipate until his faculties inform him to the contrary, that those in charge of a railroad train which might be approaching such crossing would exercise ordinary care and caution and caused a bell to be rung or whistle blown, as required by law."

Upon the correctness of the giving of these instructions a large number of cases have been cited. These cases have been considered, but only a limited number of them need to be referred to in this opinion. We have endeavored to select the cases which most clearly set forth the law involved in this action.

In the case of *Tyson* v. *Burton,* 110 Cal. App. 428 [294 Pac. 750] (hearing denied by the Supreme Court), this court had occasion to examine and list authorities involving the correctness in giving instructions similar to the two which we have set forth herein, and also as to when such instructions are proper. We began with the case of *Olsen* v. *Standard Oil Co.,* 188 Cal. 20 [204 Pac. 393], where a limitation appeared in one of the instructions, just as appears in the second instruction above set forth. We quote from the Tyson case as follows: "In support of the instruction, however, we are cited to the case of *Olsen* v. *Standard Oil Co.,* 188 Cal. 20 [204 Pac. 393, 395], where a somewhat similar instruction was given to the jury reading as follows: 'The presumption is that

every man obeys the law, and the presumption in this case is that the plaintiff was traveling at a lawful rate of speed, and on the proper side of the highway at all times. This presumption is in itself a species of evidence, and it shall prevail and control your deliberations until, and unless it is overcome by satisfactory evidence.' At first reading it might seem that the approval of the instruction which we have just quoted is conclusive in favor of the instruction involved in the instant case. A closer inspection of the instruction given in the Olsen case and relied upon by the respondent in support of the instruction given in the instant case, shows that the two instructions are readily distinguishable. In the instant case no limitation is placed upon the instruction, and the presumption was not only declared to be a species of evidence, but was to be considered by the jury at all times in its deliberations, and in that particular differs very materially from the limitation placed upon the instruction in the Olsen case. There it is said: 'This presumption is in itself a species of evidence, and it shall prevail and control your deliberations until, and unless it is overcome by satisfactory evidence.' It may be further observed that the opinion in the Olsen case does not cite or analyze any former cases where a like presumption has been held applicable to instances where all the parties are alive and the circumstances are fully testified to by them and by eye-witnesses. The cases which have been called to our attention, and which we have been able to discover where the presumption as to taking care of one's self and obeying the law, relate to instances where one of the parties is deceased. As said in *Gorman* v. *County of Sacramento*, 92 Cal. App. 656 [268 Pac. 1083, 1085]: 'There is also another well-recognized rule of law applying to accidents like the one in the case at bar, to-wit, that deceased is presumed to have exercised ordinary care for his own safety.' This rule is fully and fairly stated by Mr. Justice Henshaw in the case of *Crabbe* v. *Mammoth Channel G. M. Co.*, 168 Cal. 500 [143 Pac. 714, 716], as follows: 'Where death is occasioned under circumstances such as this, without eye-witnesses, the law comes to the aid of the plaintiff who is pressing a suit in damages for the death, and that law is found in the presumption of the Code of Civil Procedure—namely, that a person takes ordinary care

of his own concerns. (Sec. 1963, subd. 4, Code Civ. Proc.) This is a controvertible presumption, it is true, but until controverted, it is evidence in accordance with which the jury is bound to decide.' (Citing *Boyle* v. *Coast Imp. Co.*, 27 Cal. App. 714 [151 Pac. 25]; *Kreitzer* v. *Southern Pac. Co.*, 38 Cal. App. 654 [177 Pac. 477].) And as said in the leading case of *Larrabee* v. *Western Pac. R. Co.*, 173 Cal. 743 [161 Pac. 750, 751]: 'But touching the presumption that the deceased exercised ordinary care, it is to be noted that that presumption is given weight only in the absence of evidence on the subject of the deceased's conduct. It has been declared to be an artificial presumption of so weak a character that it is not to be allowed to have the effect of evidence before the jury, where the uncontradicted evidence of the circumstances attending the accident overthrow it.' A large number of cases are cited in this opinion. A well-considered opinion citing authorities on the subject of the application of the presumption that a party takes due care of his own welfare is to be found in the case of *Ross* v. *San Francisco-Oakland T. Rys. Co.*, 47 Cal. App. 753 [191 Pac. 703]. It is there held that the presumption is applicable where one party is deceased, and the death of the party is alleged to be due to the negligence of the one against whom the action is prosecuted and there were no eye-witnesses to testify to facts controverting the presumption. To the same effect is the case of *Hatzakorzian* v. *Rucker-Fuller Desk Co.*, 197 Cal. 82 [41 A. L. R. 1027, 239 Pac. 709]. In that case there was no testimony as to the conduct of the defendant, and the presumption of due care was allowed to support the judgment. See, also, *Blackwell* v. *American Film Co.*, 189 Cal. 689 [209 Pac. 999]; *Carpenter* v. *Atchison, T. & S. F. R. Co.*, 51 Cal. App. 60 [195 Pac. 1073]. In the case of *Ryan* v. *Union R. Co.*, 46 Utah, 530 [151 Pac. 71, 74], the supreme court of Utah, considering the question of presumptions, held as follows: 'In the absence of evidence, there is a presumption that the deceased used due care, and for his protection did all that reasonably was required of him. . . . When, however, facts and circumstances are proven to show just what the deceased did, or failed to do, then his care or wantonness is to be determined not on the presumption, but upon the facts and circumstances proven.' "

In *Pinello* v. *Taylor,* 128 Cal. App. 508 [17 Pac. (2d) 1039], an instruction was given similar to one challenged herein. The court there said: "The general rule is that every person has a right to presume that every other person will perform his duty and obey the law, and in the absence of reasonable ground to think otherwise, it is not negligence to assume that he will not be exposed to danger which will come to him only from violation of law or duty by such person." (Citing a number of authorities.) This comment by the court is based upon the theory that the instruction should be limited, as pointed out in the Tyson case, from which we have quoted.

In the case of *Dullanty* v. *Smith,* 203 Cal. 621 [265 Pac. 814], an almost identical instruction was upheld by the Supreme Court. The instruction there given reads: "I instruct you that a person lawfully and carefully using a street has the right to assume that all other persons using the street will also use ordinary care and caution."

In contravention of the foregoing authorities and others which we will hereafter cite, the appellants rely strongly upon the case of *Koster* v. *Southern Pac. Co.,* 207 Cal. 753 [279 Pac. 788]. The facts of that case, however, are readily distinguishable from the facts involved herein. There atmospheric conditions did not limit visibility. There were no objects obstructing the view, with which the driver of the car involved was unfamiliar. Ample opportunity to observe the approach of the train was afforded if the driver of the car would only use the means clearly afforded him. All he had to do was to look, at a proper distance from the danger zone. If he had looked, the court held that he must have seen, and therefore the conclusion was arrived at that he did not look.

The facts disclosed in the opinion in the case of *Christianson* v. *Southern Pac. Co.,* 133 Cal. App. 515 [24 Pac. (2d) 536], lead us to the conclusion that the ruling there had is not determinative of the questions presented for our consideration. In the Christianson case there was, just as here, quite a heavy fog. The testimony shows, however, that the train which collided with the automobile which Mrs. Christianson was driving could be seen for at least 200 feet; that the crossing was protected by a wig-wag signal, which in addition to swinging back and forth, also was supplemented

by a ringing bell; that Mrs. Christianson had stopped before going upon the crossing for the purpose of allowing a train passing in one direction to go by, and thereafter drove upon the crossing and was killed by a train proceeding in the opposite direction. In addition, the facts show that a red light was displayed at the crossing indicating the approach of the train. There was also testimony as to the whistle being blown. Having stopped her automobile before proceeding over the crossing, in view of the signals to which we have referred, the conclusion necessarily follows that Mrs. Christanson, instead of further acting upon the information which she had received of the dangers of proceeding, disregarded the same and attempted to drive her automobile over the crossing notwithstanding the hazard of so doing, of which the facts disclosed demonstrate that she was well aware. Nothing of that kind appears in the record which we are considering. Likewise, an examination of the opinion in the case of *Friddle* v. *Southern Pac. Co.*, 126 Cal. 388 [14 Pac. (2d) 568], discloses the inapplicability of the ruling there had to the facts involved in the case which we are considering. In the Friddle case the view of the deceased was unobstructed. The deceased was driving a truck along a highway paralleling the tracks of the railroad company for a considerable distance. We quote the following from the opinion: ''The evidence adduced by plaintiff discloses a man familiar with the locality and driving conditions there existing, driving a truck at a speed of approximately 35 miles per hour. It shows this driver in a position of complete safety on a highway paralleling a railroad track upon which a train is approaching a crossing at a speed of 50 miles per hour, which train is at a distance of between 250 and 350 yards directly behind the truck. The location of the highway upon which the truck is being operated is 62 feet from the rails. It discloses the driver of the truck, with the train rushing to the crossing, turning from his place of safety directly into the path of the oncoming train. We may then reasonably and seasonably inquire by what process of reasoning can we indulge the presumption that the truck driver exercised due care for his own safety.'' We are confronted in this case with no such facts. We have an obstructed view and testimony upon which the jury was entitled to

act, that no warning signals were given of the approach of the train. Whether the oncoming train was making considerably less noise than usual by reason of the fact that the engine was practically drifting, using only ten pounds of steam, was a matter for consideration by the jury. In the instant case, whether the deceased did or did not stop and look is practically immaterial, for the simple reason that looking for the approach of a train that could not be seen under the prevailing conditions would have been a useless proceeding; that the jury had a right to assume that the deceased did not hear the approach of the oncoming train from the testimony of the other members of the caravan that such approach was unheard by them. The fact that the living members of the caravan did not hear the approach of the train, being in the same relative position other than immediately upon the track, is some evidence at least that the deceased did not hear any noise made by the approaching train,—not to here mention signals.

All of the cases which we have cited we deem, however, controlled by the decision of the Supreme Court in the case of *Smellie* v. *Southern Pac. Co.*, 212 Cal. 540 [299 Pac. 529], as to the correctness of giving an instruction that a deceased is presumed to have exercised due care for his own safety, and that this presumption is evidence in the case, and is to be so considered unless it is dispelled and overcome by the testimony that in certain instances such a presumption may outweigh testimony to the contrary. The language of the Supreme Court in the Smellie case is "that a presumption is evidence and may in certain cases outweigh positive evidence adduced against it, has long been the settled law of this state". (Citing a number of cases.) We do not need to cite authorities to the effect that where different minds may draw different conclusions from the conditions presented for consideration, the cause presents facts for the jury to determine, and not of law for the decision of the court.

■ Based upon the testimony as to the prevailing conditions on the morning of January 28, 1935, the testimony of numerous witnesses that no warning signals were given of the approach of the train, aided by the presumption that the deceased exercised the requisite care for his own safety,

we must hold that whether the deceased was or was not guilty of contributory negligence, presented a question of fact for the jury to decide, and that decision having been adverse to the appellants, must be accepted by the court.

As to the obstruction of view by the foggy condition of the morning and the additional obligations cast upon the respective parties, we think it unnecessary to do more than refer to the opinion in the case of *Hoffman* v. *Southern Pac. Co.*, 101 Cal. App. 218 [281 Pac. 681], and the same case reported in 215 Cal. 454 [11 Pac. (2d) 387], adopting in part the opinion of the Appellate Court.

The objection that the court erred in giving an instruction to the jury in the language of section 486 of the Civil Code does not appear to us to be well taken. There are several provisions in that section which may constitute negligence and give rise to a cause of action other than that of mere speed alone. No regulations are shown to have existed regulating the speed of the train as it came to the Power Line crossing. Therefore, the only duty of the railroad company was to regulate the speed of the train so as not to have added to the hazard of others possessing a right to use the same crossing. If, in exercising its right to propel its train over the Power Line crossing without giving the necessary warning of its purpose so to do, anyone was proximately injured thereby without any contributory negligence on his own part, the company would be liable irrespective of the question of speed. In the instant case the testimony, as we read it, is all directed to the question of the silent approach of the train, and was the vital issue establishing the negligence of the appellants, irrespective of the question of speed, and if, in so doing, as we have stated, the deceased, not contributing to his own injury, was killed, liability on the part of the appellants became fixed. The instruction certainly did not mislead the jury. In what we have said in the foregoing we have not overlooked the fact that one approaching a railroad crossing must exercise ordinary care for his own safety, as a railroad crossing is always an evidence of danger.

Finally, the appellants urge that the verdict as reduced by the trial court was and is excessive. This presents a question always surrounded by more or less uncertainty, and cannot be adjudicated along any fixed and unvarying

lines. We may here add, also, that the earning capacity or possibilities of anyone, during the years 1933 and 1934, owing to the chaotic economic conditions, cannot be considered as furnishing a just rule for estimating earning capacity. At the time of the death of Lahey he had a life expectancy of a trifle over twenty-one years. During a portion of his life he was employed as a miner, earning an income of a trifle over $190 per month. From October, 1923, to March, 1929, his earning appears to have been somewhere in the neighborhood of $150 per month. This was while he was living at Longview, Washington. Thereafter, he moved to Burns, Oregon, where he lived two years, and earned approximately $200 per month. The family afterwards moved to Klamath Falls, Oregon, where the deceased lived from January, 1931, to May, 1932, where he earned approximately $250 per month. Coming to Sacramento in May, 1932, his average income was cut down to about $100 per month. Subsequently he became a worker in the organization known as SERA, earning about $60 a month. This is outside of the pecuniary loss suffered by the family in comfort, protection and society. As said in some of the cases cited, notably, in *Skelton* v. *Pacific Lumber Co.*, 140 Cal. 507 [74 Pac. 13], and *Blackwell* v. *American Film Co.*, 189 Cal. 689 [209 Pac. 999] : "The proof of the value of the deceased as a wage-earner might not alone justify the amount awarded, but there were other elements to be considered by the jury which they alone were competent to consider." In view of all the facts which the jury were entitled to consider, we do not feel justified in concluding that the verdict was excessive.

It follows from what we have said that the court did not err in denying appellants' motion for a directed verdict; that the ruling of the court denying appellants' motion for judgment, notwithstanding the verdict, was correct; and that the judgment and orders of the trial court should be affirmed. And it is so ordered.

Thompson, J., and Pullen, P. J., concurred.

A petition by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on November 30, 1936.