[Civ. No. 11795.   First Dist., Div. One.   May 4, 1942.]

MARY BELLE EASTMAN et al., Respondents, v. ATCHISON, TOPEKA & SANTA FE RAILWAY COMPANY (a Corporation) et al., Appellants.

654

Robert Brennan, Leo E. Sievert, M. W. Reed and H. K. Lockwood for Appellants.

Nichols & Richard and Arthur L. Shannon for Respondents.

KNIGHT, J.—Defendants appeal from a judgment for $20,000 entered upon the verdict of a jury in an action for damages arising out of a collision between a local, five-car Santa Fe passenger train and an automobile driven by Lawrence W. Eastman. The collision occurred about 8:30 p. m., Saturday, June 24, 1939, in the city of Albany, at the Solano Avenue crossing of the Santa Fe track. Eastman was the sole occupant of the automobile, and he died shortly after the accident from the injuries received. At the close of the evidence defendants moved for directed verdicts upon the following grounds: that plaintiffs failed to prove that the defendants, or either of them, were guilty of any negligence that proximately contributed to the accident; that the evidence

proves that plaintiffs' decedent was guilty of negligence that proximately contributed to the accident; and that there was not sufficient evidence of negligence to support a verdict. The motions were denied. As grounds for reversal defendants urge that the evidence is legally insufficient to sustain the verdict and judgment; that the trial court erred in denying their motions for directed verdicts; and that it gave instructions at the request of plaintiffs and of its own motion which were prejudicially erroneous.

Solano Avenue runs in a generally east-west direction. It is the main artery through the city, and along the center the Southern Pacific Company maintains a single track thereon for its interurban trains. It is intersected by Masonic Avenue, and approximately 75 feet east of the Masonic Avenue intersection the Santa Fe main line single track runs parallel with Masonic Avenue, and crosses Solano Avenue in a northerly and southerly direction. The defendant company maintained a wigwag signal on the north curb line of Solano Avenue, about 15 feet west of its track; also a cross-arm signal on the opposite side of the street. The wigwag signal consisted of a pendulum-like disk which when set in motion oscillated back and forth, and automatically turned on a red light and started the ringing of a bell. A two-story structure, 20 by 20 feet, called the Masonic Tower, stood just west of the wigwag, about 40 feet west of the Santa Fe track, and 15 or 20 feet north of the north curb line of Solano Avenue. It was owned and maintained by the Southern Pacific Company, wherein it kept a tower-man to give signals for the operation of trains of both railroad companies over the crossing. There was a hedge growing a few feet distant from the easterly side of the tower and parallel therewith; also a couple of small trees; and two poles stood near the hedge, all within the property line.

The decedent was a real estate salesman and lived near the scene of the accident. Shortly before it occurred he had phoned to his wife from San Pablo Avenue that they were going out for the evening with some other salesmen, and he told her he would pick her up in a few minutes in front of a drug store on Solano, about a block from their home, where he would stop for some cigarettes. He drove easterly along Solano Avenue, and as he was crossing the track his car was struck by the train which entered the crossing from the north side. The record is barren of any evidence showing that upon approaching the track the decedent slackened the rate of speed he was

travelling, and it affirmatively shows without conflict that before attempting to cross the track he did not stop; but it was claimed by plaintiffs that the wigwag signal did not start operating until the engine entered the crossing, and that the engine crew gave no warning whatever of the approach of the train. On those issues defendants introduced an abundance of convincing testimony showing that the wigwag was in full operation continuously from the time the train reached a point more than 500 feet up the track; furthermore that the locomotive whistle was sounded twice, the first time several hundred feet distant from the crossing, and again as it reached and entered the crossing; and that the engine bell was ringing and its headlight burning. But the question here presented is whether it may be so held as a matter of law in view of contrary testimony given by a witness produced by plaintiffs who saw the accident as he approached the crossing in his automobile from the west side.

The following is a résumé of the evidence relied on by defendants: The Southern Pacific tower-man, stationed in the Masonic Tower, testified that he heard the train whistle first when it was probably half a mile north of the intersection, and he cleared the signals for the passing of the train; that when the train was 700 or 800 feet away he heard it give the regular crossing whistle—two long blasts and two short; and it whistled again just before it crossed Solano Avenue; that it started to give the regular crossing whistle but "there was something peculiar about the last two whistles that drew my attention that there might be something wrong"—"when he started to whistle these two last shorts he kind of drawed one out a little bit, that's what called my attention, so I thought something was wrong, and I glanced across the street and I saw this automobile speeding there almost to the train"; that the automobile was then 40 or 50 feet from the track, travelling toward the train at a "very high rate of speed," estimated by the witness to be from 35 to 40 miles an hour. He further testified that when the train was 500 or 600 feet away the wigwag began to operate; that when the engine was 500 feet away the wigwag was working—the bell on the wigwag was ringing and the light was burning; that he had seen the headlight of the engine when it was 300 or 400 feet up the track; and that the train was travelling 12 or 15 miles an hour; that when it stopped the engine and the first car were just past the south curb line of Solano Avenue, and the third car was right across the street.

The engineer of the train (one of the defendants herein) giving his testimony by way of deposition, testified that the train was travelling between 13 and 15 miles an hour as it approached the crossing at Solano Avenue; that the engine had an automatic bell which was ringing, and the last time he sounded the whistle was just before he reached Solano Avenue, and that he stopped sounding it only upon reaching the street. In describing the accident he stated he first saw the automobile about 20 feet from the track, east of the signal tower; it was "coming at a pretty good rate" and he "couldn't tell whether it was going to hit the pilot or not"; it "dashed right across in front of the engine," and the moment he saw it he immediately applied the emergency brakes, shut the throttle off and turned on the "sanders," but before he could fully apply the brakes the train hit the automobile; that the train stopped about a car's length after the impact, the third car blocking the street. He stated that he did not notice whether the wigwag was operating as he approached the crossing, but that it was in full operation the entire time the train stood on the crossing; and that after he backed the train to clear the crossing he got out to investigate and the wigwag was still working.

The fireman on the train testified that the train was travelling about 15 miles an hour; that the bell was ringing automatically—the engineer had turned it on at Richmond; that the first whistle was given when the train was about 300 feet north of the crossing—"two longs and two shorts"—and then it sounded as if the engineer started to blow another crossing whistle and ended with a long blast; that his attention was attracted by this whistle, and he glanced over in time to see the engineer "turn loose the whistle cord and grab the emergency brake valve"; that he then saw the headlights "coming through" the front end of the locomotive (he was on the opposite side from which the automobile was approaching), and he next saw the automobile come out on the left (his) side of the locomotive and roll over into the vacant lot. Afterwards the train was backed over the crossing and the fireman said he and the engineer both got down and examined the wigwag and it was working.

In addition to the foregoing, defendants produced two witnesses who lived near the scene of the accident, and they testified that they heard the warning given of the approach of the train. One, Don Carter, lived on the corner of Masonic and Solano, on the south side of Solano, and was in his bathroom

on the east side of the building (facing the track). He testified that he heard the train coming, and "the thing that called my attention to something being wrong was a long blast of the whistle, and then I heard a crash"; that the train gave the ordinary two long and two short blasts, and then a long warning blast immediately before the crash occurred. The other witness was Mrs. Harriss, who lived about 300 feet north of Solano, between Masonic and the Santa Fe tracks. She testified that she heard the train whistle just before it passed her house; that it was whistling as it went by, and the bell was ringing; that her little 20 months old daughter heard the whistle and wanted to watch the train go by, which was the reason Mrs. Harriss noticed the train; then suddenly it became very quiet and she went to look, and saw the train had stopped, the rear end of it just opposite the house next to Harriss's.

The witness produced by plaintiffs was William J. Yore, an employee of the National Park Service. He was driving a Plymouth coupe and was accompanied by his mother-in-law, who sat beside him holding in her lap Yore's infant niece, a year and a half old. Yore testified that he was driving westerly on Solano Avenue, about 15 to 20 miles an hour; that when he reached a point about 100 feet from the railroad track he looked north and could see some 300 feet up the track, but did not see or hear any train; that he looked at the wigwag and it was not operating; that when he was 60 or 70 feet from the track he could see 400 or 500 feet up the track but still saw no train; that he looked at the wigwag again and it was not operating; that when he was about 50 feet from the track he saw the decedent's car approaching in the opposite direction, about 30 feet from the track; that it was "proceeding at a leisurely rate"; that when he (the witness) was about 30 feet from the track he saw the headlight of the approaching train, which was then 60 or 70 feet up the track, and he pulled in to the curb and stopped about 12 or 15 feet from the track; that the wigwag was not going just before the train hit the crossing, but as the train came up to the crossing and just before it passed in front of him the wigwag started and he heard "a very slight bell"; that up to that time he heard no bell at all, and at no time did he hear any whistle.

It is doubtless the law that failure to comply with the regulations prescribed by section 486 of the Civil Code as to ringing the bell and blowing the whistle of a railroad train upon approaching a street crossing is prima facie evidence of negligence on the part of the railroad company (*Parker* v. *Southern*

*Pacific Co.,* 204 Cal. 609 [269 Pac. 622] ; *Orcutt* v. *Pacific Coast Ry. Co.,* 85 Cal. 291 [24 Pac. 661] ) ; and that where the evidence is conflicting as to whether the train crew complied with such statutory requirement, the implied finding of the jury adverse to the railroad company is binding on appeal. (*Krause* v. *Rarity,* 210 Cal. 644 [293 Pac. 62, 77 A. L. R. 1327] ; *Pietrofitta* v. *Southern Pacific Co.,* 107 Cal. App. 575 [290 Pac. 597] ; *Hoffman* v. *Southern Pacific Co.,* 215 Cal. 454 [11 P. (2d) 387].) Furthermore, the courts have held that if a witness is in a position to hear the bell or the whistle of the locomotive and he testifies he heard neither, such testimony is sufficient to raise a conflict with positive testimony to the contrary that such warnings were given. (*Jones* v. *Southern Pacific Co.,* 74 Cal. App. 10 [239 Pac. 429] ; *Lindsey* v. *Pacific Electric Ry. Co.,* 111 Cal. App. 482 [296 Pac. 131] ; *Lahey* v. *Southern Pacific Co.,* 16 Cal. App. (2d) 652 [61 P. (2d) 461] ; *Hamilton* v. *Pacific Electric Ry. Co.,* 12 Cal. (2d) 598 [86 P. (2d) 829] ; *Thuet* v. *Southern Pacific Co.,* 135 Cal. App. 527 [27 P. (2d) 910].) ▉ Applying those legal principles to the state of the record here, it is apparent that unless some legal justification is shown for the rejection of Yore's testimony, it is sufficient to support the implied finding of the jury that defendants were negligent, irrespective of the amount of testimony introduced by them in contradiction thereof.

Defendants contend, however, that with respect to Yore's testimony the situation calls for the application of the rule that a court may reject positive testimony where its inherent improbability is such as to deny it all claims to belief (*Dierks* v. *Newsom,* 49 Cal. App. 789 [194 Pac. 518] ; *Zibbell* v. *Southern Pacific Co.,* 160 Cal. 237 [116 Pac. 513] ) ; that this rule applies where the testimony bears within itself ''the seeds of its own destruction,'' as where it is inherently improbable, or its destruction is wrought from without, as where the witness is in some manner impeached (*Market Street Ry. Co.* v. *George,* 116 Cal. App. 572 [3 P. (2d) 41] ) ; and that this is such a case; that beyond doubt Yore's testimony was proved to be inherently untrue. The main point defendants make in this behalf is that the uncontradicted evidence produced by them as to the construction and mechanical operation of the wigwag proves conclusively that it was mechanically impossible for the wigwag to start operating as claimed by Yore, just as the train reached the crossing. The evidence consisted of the testimony given by C. M. Morris, the signal maintainer for the Santa Fe

in that district; and the facts established thereby were these: An electric wire or connection runs northward from the Solano Avenue crossing where the signal is installed to a point 760 feet up the track, and at the end of the wire there is a device that starts the wigwag operating. It is at that point that the train makes the contact from one rail to the other by shorting the circuit and starting the wigwag. The contact is made by the first wheels of the locomotive, so that when the locomotive passes over the point of contact 760 feet north of the crossing the wigwag starts operating. The contact can be made at no other point north of the crossing, and after the wigwag is started it will not stop until the train passes over the Solano Avenue crossing. There the relay interlocks and the signal stops operating. While the train stands on the crossing the wigwag operates continuously. He testified positively that there was no possible way of starting the wigwag by a train approaching from the north except from this point of contact 760 feet north of the crossing; that if it does not start when the train reaches that point, it will not start at all. Furthermore he testified that in performing his duties as signal maintainer he had inspected this wigwag the day before the accident and two days after the accident; that on both inspections the wigwag was in perfect working order; that the work of inspection consists in cleaning the wigwag and seeing if the contacts are good; then placing a bar across the track at the contact point, which drops the relay at the wigwag and starts its operation.

Another point made by defendants is that if as Yore claimed the wigwag did not start to operate until the engine crossed into the intersection, he could not have seen the wigwag start at all because at that very moment it was cut from his view by the passing train. They make the additional point that according to Yore's testimony as to the speed of the train and of his automobile, and the distances travelled by each, the train must have travelled over 400 feet in less than a second, which they claim was impossible. Finally, defendants refer to the apparent unusual interest Yore took in the case, by going out to the scene of the accident on two different nights following the coroner's inquest. The first night he took certain measurements by pacing the distances; and the second night he spent an hour counting the automobiles passing over the crossing.

We are of the opinion that the facts and circumstances relied upon by defendants are not of such a character as would warrant the rejection of Yore's testimony under the rule defen-

dants seek to invoke; but on the contrary that they properly fall within the operation of the well-settled doctrine that conflicts in the testimony must be resolved in the trial court, and that the credibility of witnesses and the weight to be given to their testimony are matters which necessarily must be determined by the triers of the facts. Yore's testimony as to the operation of the wigwag is not comparable with that challenged in the case of *Billig* v. *Southern Pacific Co.*, 192 Cal. 357 [219 Pac. 992], cited by defendants, for there the testimony of the witness as to whether the wigwag was moving and was lighted with the bell ringing as he approached the crossing was, as the court there stated, negative and amounted to no more than that he saw the wigwag for the first time when within 6 feet of the crossing, and that its movements within his view began at that time; while here Yore testified that he observed the wigwag three separate times; first when he was 100 feet from the crossing, again when he was about 60 or 70 feet therefrom, and a third time when he was 30 feet from the crossing, and that at none of those times was it operating. It is our conclusion, therefore, that for the reasons hereinabove stated, defendants' contention that the evidence is not sufficient to establish negligence on their part is not sustainable.

█ Nor can we uphold defendants' second major contention that the evidence as a matter of law establishes contributory negligence on the part of the decedent. █ It is only where but one conclusion can reasonably be drawn from the evidence that the question of contributory negligence becomes one of law for the court to determine. Even in the absence of conflict in the evidence, contributory negligence is a mixed question of law and fact which should be left to the jury, if different conclusions upon the matter may rationally be reached from the evidence adduced. (*Robbins* v. *Southern Pacific Co.*, 102 Cal. App. 744 [283 Pac. 850].) In dealing with the question of contributory negligence in cases of this kind, the court in *Will* v. *Southern Pacific Co.*, 18 Cal. (2d) 468 [116 P. (2d) 44], said in part: "The tracks of a steam railroad are a sign of danger, and one intending to cross them must avail himself of every opportunity to look and listen. The degree of care to be exercised is dependent upon the circumstances in the particular case. If there are obstructions to the view, one is required to take a greater amount of care. (*Herbert* v. *Southern Pac. Co.*, 121 Cal. 227 [53 Pac. 651].) However, the same quantum of care is not required of a traveler approaching a rail-

road crossing at which a bell or signal has been erected to warn him of danger. (*Vaca* v. *Southern Pac. Co.*, 91 Cal. App. 470 [267 Pac. 346]; *Gregg* v. *Western Pac. R. R. Co.*, *supra* [193 Cal. 212 (223 Pac. 553)]; *Crawford* v. *Southern Pac. Co.*, 3 Cal. (2d) 427 [45 P. (2d) 183].) A railroad company will not be permitted to encourage persons to relax their vigil concerning the dangers that lurk in railroad crossings by assuring them, through the erection of safety devices, that the danger has been removed or minimized, and, at the same time, to hold them to the same degree of care as would be required if those devices had not been provided. (*Gregg* v. *Western Pac. R. R. Co.*, *supra; Marini* v. *Southern Pac. Co.*, 201 Cal. 392 [257 Pac. 74].) This does not mean that a person approaching a guarded crossing may blindly rely upon the absence of warning by a watchman, or the silence of an automatic signal, and proceed without further regard for his own safety. Knowing that he is approaching a point of danger he must still use reasonable care in looking and listening for any approaching trains. Failure to do so constitutes contributory negligence, as a driver may not cross tracks in reliance upon the safety appliances installed by the railroad with complete disregard for his own safety and recover damages for injuries sustained by reason of his own failure to use reasonable care. (*Crawford* v. *Southern Pac. Co.*, *supra*.)'' In addition to the cases above cited there should be added *Ogburn* v. *Atchison etc. Ry. Co.*, 110 Cal. App. 587 [294 Pac. 491], wherein several of the cases cited in *Will* v. *Southern Pacific Co.* are reviewed; and in quoting from *Gregg* v. *Western Pac. R. R. Co.*, 193 Cal. 212 [223 Pac. 553], it is said: ''If a reasonably prudent person situated as appellant was situated, and seeing what he then saw and knew, would have been justified in acting upon appearances as appellant assumed to do, or, if reasonably prudent men would disagree as to whether appellant exercised ordinary care in the premises, then the case should have gone to the jury. The invitation to cross, the failure to ring the bell or sound the whistle, as required by the provisions of section 486 of the Civil Code, are elements which must be considered with all the other facts and circumstances of the entire case.''

The present case is admittedly a guarded crossing case, and testimony was placed before the jury that as the train neared the crossing the engine crew gave no warning of its approach and the wigwag was not operating. Therefore, under the circumstances of the case and the law as declared in the deci-

sions above cited, a lesser degree of care was reasonably to be expected from the decedent than would have been the case had the wigwag signal not been installed and used at that particular crossing. █ While the presence of this automatic device did not relieve the decedent from exercising such care for his own protection as was reasonable under the circumstances, the question of the precise measure of care still legally required of him was not a question of law, but depended upon the circumstances there existing, and was one of fact upon which the jury's determination is conclusive on appeal. (*Lahey* v. *Southern Pacific Co.*, 16 Cal. App. (2d) 652 [61 P. (2d) 461]; *Ogburn* v. *Atchison, etc. Ry. Co., supra; Will* v. *Southern Pacific Co., supra.*)

█ Defendants state that if the decedent had exercised ordinary care he would have seen the headlight of the approaching train; but under the rule of the authorities cited, this was one of the questions of fact to be considered and determined by the jury. To this may be added the application of the principle that where death has resulted from the accident and the lips of the injured party are thus sealed, it will be presumed, in the absence of evidence to the contrary, that the deceased exercised ordinary care for his own safety. (*Robbins* v. *Southern Pacific Co., supra,* citing *Larrabee* v. *Western Pac. R .R. Co.*, 173 Cal. 743 [161 Pac. 750].) █ This presumption is evidence in the case, and is to be so considered, unless it is overcome by satisfactory evidence, that is, unless the evidence of the party in whose favor the presumption is sought to be invoked is in conflict therewith (*Smellie* v. *Southern Pacific Co.*, 212 Cal. 540 [299 Pac. 529]); where it is not so controverted, it merely raises a conflict with the opposing evidence, and the jury is warranted in finding in accordance with the presumption (*Westberg* v. *Willde*, 14 Cal. (2d) 360 [94 P. (2d) 590], citing numerous cases; *Smellie* v. *Southern Pacific Co., supra*).

█ Since, therefore, the evidence adduced at the trial did not establish as a matter of law that the decedent was guilty of contributory negligence, and was legally sufficient to establish negligence on the part of defendants, the motions for directed verdicts were properly denied.

█ The first four instructions assigned as erroneous are obviously based on the legal doctrine declared in the cases above cited, especially the Robbins, Gregg, Ogburn and Will cases, to the effect that a person crossing a railroad track guarded by safety devices is not required to exercise the same quantum of

care which would be required of him if he were crossing an unguarded crossing. Defendants' criticism of the instructions is that they were calculated to give the jury the impression that if the wigwag was not working the decedent was not required to look and listen carefully before crossing the railroad track, and that therefore the instructions were misleading. We do not agree that the instructions are subject to such criticism, and especially when they are read and considered with the following instruction which the court also gave: "You are further instructed that the tracks of a railroad when visible are in themselves a warning of danger. Before one drives a vehicle into the space which would be occupied by a train if it were to pass over such tracks, it is his duty to use every reasonable opportunity to look and listen for the approach of train, engine or car on the tracks, and what is included in the term 'every reasonable opportunity,' depends on all the surrounding circumstances as they would be met and viewed by a person of ordinary prudence if he occupied the same position as the one whose conduct is in question. If the view of the tracks is obstructed, then greater caution is required in approaching them. If the obstruction is such that one cannot obtain, without stopping, a reasonably assuring view of the tracks, in both directions, before entering the dangerous track area, then ordinarily it is his duty to stop, and if necessary to alight from his vehicle to obtain such a view. However, the duty I have mentioned of making precautionary observations of railroad tracks is not an absolute one; that is to say, it is not one that the law can arbitrarily standardize in advance for all circumstances, nor does the law attempt to do so."

However, defendants attack the correctness of this latter instruction upon the ground that the qualifying words of the last sentence thereof "make a highly prejudicial instruction out of what, without them, would have been a good instruction." In this regard defendants state that the court first lays down the correct standard of conduct and then in the last sentence "strikes down this standard of conduct" and thus confused the jury. It is evident, however, that the language used in said last sentence cannot be deemed prejudicial because it is founded upon and substantially conforms to the legal doctrines stated in *Robbins* v. *Southern Pacific Co., supra; Ogburn* v. *Atchison, etc. Ry. Co., supra; Hoffman* v. *Southern Pacific Co.,* 101 Cal. App. 218 [281 Pac. 681]; also *Cooper* v. *Southern Pacific Co.,* 43 Cal. App. (2d) 693

[111 P. (2d) 689], which may be taken as additional authority in support of the conclusions arrived at herein respecting the matter of conflicting evidence and the issue of contributory negligence.

The following is the remaining instruction to which defendants object: "At the outset of this trial each party is entitled to the presumptions of law that every person takes ordinary care of his own concerns and that he obeys the law. These presumptions are a form of prima facie evidence, and will support findings in accordance therewith in the absence of evidence to the contrary. Where there is other evidence that conflicts with such a presumption, it is the jury's duty to weigh that evidence against the presumption, and any evidence that may support the presumption, to determine which, if either, predominates. Such deliberations, of course, shall be related to, and in accordance with my instructions on the burden of proof." The instruction finds full support in the Smellie, Lahey and Westberg cases, to which reference has already been made. We are unable to agree with defendants' contention that where there are eye-witnesses to the accident the presumption is not applicable. (See *Ellison* v. *Lang Transportation Co.*, 12 Cal. (2d) 355 [84 P. (2d) 510]; *Westberg* v. *Willde, supra; Scott* v. *Sheedy*, 39 Cal. App. (2d) 96 [102 P. (2d) 575], and other cases cited in plaintiffs' brief.)

The judgment is affirmed.

Peters, P. J., and Ward, J., concurred.

A petition for a rehearing was denied June 3, 1942, and appellants' petition for a hearing by the Supreme Court was denied July 2, 1942. Gibson, C. J., Edmonds, J., and Traynor, J., voted for a hearing.