[Civ. No. 7854. First Appellate District, Division One.—May 31, 1932.]

MABEL JONES et al., Respondents, v. ELIZABETH M. HEDGES, Appellant.

Myrick & Deering and Scott and George W. Jean for Appellant.

James Snell for Respondents.

JOHNSON, J., *pro tem.*—The plaintiff, Mabel Jones, is the widow, and the eight other plaintiffs are the children, of Samuel A. Jones, who, while engaged in paving work on a highway in San Benito County, was killed on October 8, 1929, by being hit by an automobile driven by the defendant, Elizabeth M. Hedges.

The action, seeking damages for the death alleged to have been caused by negligence on the part of the defendant, was tried with a jury which rendered a verdict of $40,000 in favor of plaintiffs; and from the judgment entered in that amount, the defendant has appealed.

Besides charging error in respect of evidence and instructions, the defendant presents for consideration the legal status of the decedent as a worker on the highway, and contends that he not only assumed the risk of injury, but was guilty of contributory negligence barring recovery by his heirs, and that the amount awarded by the jury is grossly excessive.

Jones was an employee of the Granite Construction Company, which had a contract with San Benito County for the improvement of certain county roads, and among them a road known as Llewellyn-Bixby Lane, which meets, without crossing, the state highway between Hollister and San Juan, and which will hereafter be referred to as Bixby Lane. The highway, having a width of 60 feet, runs east and west; and Bixby Lane, which is 40 feet in width, runs north and south, connecting with the highway at a right angle on the northerly side and there terminating. The highway had a paved strip in the center 16 feet wide, with a concrete shoulder of 2 to 2½ feet on each side, and

with the ground to the north and the south of those shoulders left unimproved.

At the time of the accident, the work of improving Bixby Lane to its junction with the northerly boundary of the highway had been completed; and the construction company was then called upon to construct for the county, under a permit from the state highway commission, an apron to cover the unimproved part of the highway between the terminus of Bixby Lane and the central paved portion of the highway, thereby completing a surfaced connection between the two roads. The distance so covered was about 17½ feet, the apron being about 17 feet wide at the northerly edge of the highway and flaring to about 66 feet where it united with the highway pavement.

The accident resulting in the death of Jones occurred close to this apron. After the apron had been laid, it had to be oiled, so as to bind the structural material together with oil heated to a high temperature. To spread the oil, a large oiling-truck, about 27 feet in length and 10 feet in width, was used with a crew of four men, of whom Jones was one. The others were Scrivani the foreman, Wilson the driver, and Le Grande, who was stationed at the rear end of the truck in charge of the spraying. As the hot oil is released and comes in contact with the cool pavement, a black smoke, varying in density with weather conditions, is generated and carried in the direction in which the wind may be blowing.

The truck, until needed on this occasion, had been stationed on Bixby Lane close to the highway; and when the apron had been made ready for oiling by Scrivani and Jones, the truck was brought into position by the driver Wilson, so that it would travel from east to west across the apron for the distance of 66 feet where the apron made contact with the highway pavement. Before the oiling started, Wilson placed a red flag about 60 feet to the rear of the truck at a point about 4 feet to the north of the highway pavement. He then resumed the driver's seat, and Le Grande was in his place at the rear to attend to the spraying. As the truck was about to start, the foreman, Scrivani, was standing near the center of the truck, on the northerly concrete shoulder of the highway; and Jones was a little closer to the rear end of the truck,

and about on the line of demarcation between that shoulder and the highway pavement. As the two men so stood, Scrivani ordered Jones to go farther to the rear when the truck started, and to place himself beyond the northerly shoulder of the highway, and keep traffic off the freshly oiled portion of the apron. Seeing no vehicle approaching, Scrivani then gave the signal to start the truck; and as it thereupon moved slowly westward, he followed alongside, walking near the edge of the concrete shoulder, Scrivani and the two men on the truck were looking forward, and none of them saw whether Jones moved from the spot where he had stood or not. But in about three seconds after the truck had begun to move, the body of Jones was hurled past the truck after being hit by a La Salle car operated by the defendant, Mrs. Hedges; and apparently death was instantaneous. The distance from the point where Jones was last seen alive to the point where the body fell was 154 feet.

Mrs. Hedges, who lived in the neighborhood and was well acquainted with the locality, approached the junction of Bixby Lane and the highway from the east, and had with her in the front seat her two children, aged respectively seven and four. She testified that as she drove along, at the rate of about 40 miles an hour, on the northerly half of the paved highway with one wheel on the concrete shoulder, she was suddenly confronted with a smoke so dense that she said she could see nothing, not even the hood of her car; that she reduced her speed to a rate of about 25 miles as she entered the smoke, and almost instantly became aware of having hit something, whereupon she swung to her left and then again to her right, and came to a stop some distance ahead of the oiling-truck. While Mrs. Hedges said she reduced her speed, when faced with the smoke, to about 25 miles an hour, Wilson, the driver of the truck, estimated that as he saw the car pass him, it was being driven at the rate of 35 to 40 miles an hour.

The accident occurred at about half-past 2 in the afternoon on a clear day, with a light breeze blowing from the westward, and the road was a straight, level road. Mrs. Hedges knew that men had been at work on Bixby Lane close to the highway; but notwithstanding the smoke rising from the junction point, she does not appear to have

given any warning of her approach. And while she said she applied her brakes when she was entering the smoke, yet she avoided clamping them hard, as she had had experience of throwing the children forward and hurting them by slowing the car suddenly. Presumably, Jones was hit by the right headlight of the car, which was found to have been damaged.

As regards the density of the smoke and the ability to penetrate it with the eye, there is evidence contradictory of the testimony of Mrs. Hedges. About a quarter of a mile to the east of Bixby Lane, Mrs. Hedges had passed the witness Dake, an automobile salesman, who was also driving westward on the highway. Dake testified that as Mrs. Hedges passed him, she was traveling at a rate of at least 60 miles an hour. He said further that just before she passed, he observed the forms of two men near the truck moving their arms as if at work; and then as Mrs. Hedges drove by him, smoke began to rise from behind the truck in a cloud which was heavy near the ground, but became lighter at a height of about three feet, and after blowing toward him for about 15 or 20 feet, drifted away, as it thinned out, over a field to the north of the highway. The smoke, he stated, was thin enough at the top so that as he proceeded, he could see the upper part of the bodies of some men and the upper part of the truck. He testified also that he saw Mrs. Hedges' car run into the smoke until it reached the truck, and then as he saw men descend, the smoke ceased. These things were observed by him as he drove toward Bixby Lane until he came to a halt where the red flag stood.

In addition to Dake, there was also the Japanese witness, Nakata, who had been working in a neighboring field. Standing on the south side of the highway near the truck, he looked in both directions before venturing to cross, and saw a car approaching from the east about half a mile away. Then, while looking to the west, he heard a sudden noise. As he turned, he saw, at a height of about three and a half feet above the ground, "a black line coming out of the smoke", which in a moment was followed by the car of Mrs. Hedges; and as the car stopped, he saw the body of Jones lying on the ground. Nakata said that to his eye the smoke from the oiling-truck was thick from

the center to the northerly side of the highway, the thin portion reaching to a distance of about fifty feet back of the truck, but there was little, if any, smoke on the southerly side.

A considerable portion of the defendant's briefs is devoted to a discussion of the status of Jones while on the highway during the oiling operation; and it is charged that he was a trespasser, and was aiding and abetting the creation of a nuisance. This contention has for its basis the circumstances attending the contract between the county and the Granite Construction Company for laying the apron. There had been a formal contract for the improvement of Bixby Lane, and that contract was completed when the pavement had been laid to the northerly boundary of the state highway. As the apron was to be built on the highway, it was necessary for the county to have a permit therefor from the state highway commission; and that permit was duly issued on September 11, 1929, pursuant to law. (Stats. 1919, p. 138.) Under the authority of that permit, the county engineer, with the approval of the supervisors, made a verbal contract with the construction company, through its foreman Scrivani, to lay the apron at the unit price per square foot prescribed in the contract already completed. The cost of laying the apron being nominal, less than $50 in fact, the county was at liberty to dispense with the formalities prescribed in section 2640 of the Political Code for work of an expensive character. In due course, the apron was finished to the satisfaction of the county and payment made.

The defendant complains of a ruling of the court sustaining objection to her offer of the contract and specifications for the improvement of Bixby Lane. And stress is laid on provisions embodied in the specifications requiring the contractor to take suitable measures to protect the work and prevent accidents during construction, also to maintain all necessary barriers, danger-signs and watchmen, and to provide so that public travel might be maintained alongside the work during its progress. The permit of the state highway commission likewise specified that adequate provision should be made for the protection of

the traveling public, and that flagmen should be employed as might be required by the particular work in progress.

Defendant's contention is that there was failure to provide adequate protection of the public, and that, by reason of such omission, the construction company and its employees were maintaining through their work a nuisance on the highway, and that Jones was a trespasser. We do not, however, share this view.

Under the permit of the state highway commission, the county had authority to construct the apron; and the county caused the work to be done by the Granite Construction Company. That company, acting in a sense as the agent of the county, had the right, therefore, to use the equipment ordinarily employed in such work, and to occupy such portion of the highway as was reasonably necessary for the due performance of its task. Though independently of any express stipulations, the contractor was under obligation to exercise reasonable care and caution in behalf of the traveling public, yet the right to public use of the highway, while road-work is being done, is subordinate to the right of the public authorities to cause improvements to be made in the public interest. (*Township of Crescent* v. *Anderson,* 114 Pa. St. 643, 647 [60 Am. Rep. 367, 8 Atl. 379].) And even with the exercise of reasonable care and circumspection, the very nature of the work may sometimes create perils against which travelers must be on guard.

A distinction is to be marked between one who undertakes to do road work without authority and one who has permission, but in performing his work is guilty of want of care in some particular. A person obstructing a highway unlawfully is classed as a trespasser, and, being engaged in the performance of an unlawful act, may be chargeable with creating a nuisance. But when his work is being done under a lawful permit, he has the right to use the road in performance of his contract, and to employ machinery reasonably adapted to the various operations. Under such circumstances he is not a trespasser; nor is a temporary obstruction, in the course of work done under lawful authority, to be treated as a nuisance, even though, through failure to provide protection for the public, someone should be injured. Negligence, as distinguished from tres-

pass, involves doing a lawful act in a careless way; but authority to do the work relieves even a negligent contractor of the imputation of trespassing, and places him in the position of one chargeable with negligence only. (*Cunningham* v. *Wright,* 28 Hun (N. Y.), 178, 182; *Malkan* v. *Carlin,* (Sup.) 93 N. Y. Supp. 378; *Power* v. *Rodgers & Hagerty,* (Sup.) 144 N. Y. Supp. 747; *Scarpolla* v. *Oliver Typewriter Co.,* (Sup.) 165 N. Y. Supp. 885, 887; *City of North Vernon* v. *Voegler,* 103 Ind. 314, 327 [2 N. E. 821].)

In *Boston* v. *Abraham,* 91 App. Div. 417 [86 N. Y. Supp. 863], there was a situation analogous to that exhibited here. The plaintiff was the employee of a street contractor; and while engaged in digging a trench to make a water connection, he was injured through negligence of a person driving a horse of the defendant so close to the excavation that the horse lost his footing and fell upon the plaintiff. It was contended there that the excavation constituted a nuisance, and that no liability attached to the defendants. Upon this subject the court said:

"Many authorities are cited upon the proposition that a public nuisance, resulting in injury to one lawfully in the highway, gives a cause of action to the party so injured, with all of which we fully agree; but the question here presented is not an injury to the defendant or their servants, but an injury to the plaintiff, who was in the employ of one John J. Flaherty, engaged in relaying a water main in Twelfth street. . . . When the plaintiff had established a state of facts from which the jury might find that he was not guilty of any common-law nuisance, he had made a case entitling him to go to the jury, assuming that he had evidence to support the allegation of negligence on the part of the defendants, and lack of contributory negligence on his part."

So in this case it may be said that while any failure on the part of the construction company to take reasonable precautions to protect the public might have subjected that company to liability in favor of an injured traveler, nevertheless any such negligence of the contractor would not absolve this defendant of liability, if negligence on her own part caused the death of the contractor's employee while lawfully engaged in his work on the highway. Hence, even if specifications for the improvement of Bixby Lane

were to be treated as part of the contract for the apron, they would furnish no defense to the charge of negligent operation of her automobile by the defendant; and accordingly there was no error in excluding the specifications.

We are thus brought to a consideration of the case in the light of the rules applicable in actions grounded on negligence in the operation of an automobile on the highway. There was assuredly evidence sufficient to justify a finding of negligence on the part of Mrs. Hedges. Her opportunities for seeing what was before her were as good as those of the witness Dake when she passed him, and were presumably better as she drew near Bixby Lane. The road was straight and the day was clear; and before any smoke appeared, the oiling-truck, with men near by, was visible to one who looked. Yet Mrs. Hedges drove on at a rapid rate past the red flag of warning; and when the smoke rose, plunged into it without knowing, as she said, what was beyond, and without sounding the horn or effectively applying the brakes. In *Kastel* v. *Stieber*, 215 Cal. 37 [8 Pac. (2d) 474], it was held to be gross negligence as a matter of law to propel an automobile past intersecting city streets at a speed approaching 40 miles an hour; and in like manner we think it must be said to show indifference to the rights and safety of others on the state highway when an automobile is driven heedlessly at a speed of 35 to 40 miles an hour into a cloud of smoke so dense as to obscure the view ahead. (*Warren* v. *State*, 219 App. Div. 124 [219 N. Y. Supp. 530, 534].) The smoke was itself a sign of danger as categoric as a stop-signal.

The defendant contends, however, that whatever may be said of herself, the deceased was not only guilty of contributory negligence on his part, but that he came to his death as the result of a risk assumed by him; and that his heirs are therefore precluded from recovery of damages. As is said by Judge Holmes in *Schlemmer* v. *Buffalo R. & P. R. Co.*, 205 U. S. 1, 12 [51 L. Ed. 681, 27 Sup. Ct. Rep. 407], the difference between assumption of risk and negligence is one of degree rather than of kind, the practical difference being in the degree of their proximity to the particular harm. It may be conceded that in a controversy between Jones or his heirs and a driver exercising ordinary care, Jones might be regarded as having assumed

the usual risks incident to his employment; but he cannot be held to have assumed the risk of death through the *negligent propulsion* of an automobile upon him. (*Graff* v. *United Railroads,* 178 Cal. 171, 176 [172 Pac. 603]; *Gornstein* v. *Priver,* 64 Cal. App. 249, 256 [221 Pac. 396]; *Moreno* v. *Los Angeles Transfer Co.,* 44 Cal. App. 551, 555, 556 [186 Pac. 800].) If, however, Jones did or omitted something operating as a real cause of the accident, then there would be such proximity between his conduct and the collision as to constitute contributory negligence.

It must be remembered, however, that Jones was one of the crew engaged in work on the highway, and had orders from his foreman to proceed to a position on the roadside and keep traffic off the apron. The measure of his duty to exercise care in his own behalf was therefore quite different from that of the ordinary pedestrian using the roadway merely for travel. The standpoint from which his conduct is to be viewed is that of a laborer whose duties required him to station himself on the highway as directed; and he was justified in assuming that operators of motor vehicles would use reasonable care and caution commensurate with visible conditions, and would approach with their cars under reasonable control. Speaking of a street-sweeper injured while at work, this court in *State Comp. Ins. Fund* v. *Scamell,* 73 Cal. App. 285, 291 [238 Pac. 780, 782], said:

"We do not wish to be understood as holding that one so engaged is not bound to use ordinary care, but his rights cannot be determined by the same rules applicable to pedestrians generally. His care or want of care is a fact to be determined from a different standpoint. (*Clark* v. *Bennett,* 123 Cal. 275 [55 Pac. 908]; *King* v. *Green,* 7 Cal. App. 473 [94 Pac. 777].) The question of negligence under such circumstances is one for the jury or trial court. (Berry on Automobiles, 3d ed., 465; *Blackwell* v. *Renwick,* 21 Cal. App. 131 [131 Pac. 94].)"

Asserting that in being in the path of her car while wrapped in smoke, Jones was guilty of contributory negligence as a matter of law, defendant cites numerous cases; but a review of them shows that they are either cases in which a pedestrian stepped from the sidewalk into the roadway when smoke or dust temporarily obscured the

view of approaching vehicles, or cases involving collisions at railroad crossings where again different rules obtain. The distinction between such cases and this is obvious.

Defendant contends also that there was some evidence given by the witness Dake that when defendant passed him on the highway, he saw two men near the truck, who appeared to him to be moving westward; and defendant argues that if Jones was one of those men, he should have been proceeding, under section 150½ of the California Vehicle Act of 1929, close to the southerly, or left-hand, edge of the highway. Dake's testimony had reference to a time before the spraying of oil started; and the evidence is undisputed that just as the oiling was about to begin, Jones was standing near the truck, and there received his orders to station himself at a point to the eastward on the northerly side of the roadway beyond the shoulder. Under these circumstances, no violation of the section cited is shown.

There is no evidence before us fixing the precise place of the impact, nor from the record is anyone able to say what specific efforts Jones made for his own preservation. The burden to prove contributory negligence rested on the defendant; and in the absence of countervailing evidence it is to be presumed that Jones exercised all reasonable care under the circumstances in his own behalf. This presumption is equivalent to affirmative proof in favor of the plaintiffs, and is fortified by the fact that Jones had been in the employ of the construction company in road work for a period of eight years, and, according to his foreman, was a trusted employee who always did his work conscientiously. The jury were entitled, therefore, to act upon the proofs so afforded; and the evidence in general, supplemented by the presumption of law, is sufficient to sustain the implied finding of the jury that Jones was free of contributory negligence, and that his death was proximately caused by negligence of the defendant. (*Hatzakorzian* v. *Rucker-Fuller Desk Co.*, 197 Cal. 82, 96, 97 [41 A. L. R. 1027, 239 Pac. 709]; *Broedlow* v. *Le Gros*, 88 Cal. App. 671, 677 [263 Pac. 1027].) It is said in *Gay* v. *Winter*, 34 Cal. 153, 164, and quoted in *Hollowell* v. *Cameron*, 186 Cal. 530, 533 [199 Pac. 803, 805], "To hold otherwise would

be in effect to presume negligence on the part of one in excuse of negligence on the part of another.''

■ The defendant deems herself to have been prejudiced, however, by the exclusion of evidence touching some previous accident somewhere else, when, it is represented, an automobile ran into the rear of one of the construction company's oiling-trucks while enveloped in smoke. Evidence of previous similar accidents under like conditions is sometimes admissible to show the dangerous character of a particular place or instrumentality, and to bring home to one charged with its maintenance or control knowledge of a hazard against which others should have been safeguarded. The issue here, however, was not whether the construction company had failed in some duty owed to Mrs. Hedges, but whether she was herself guilty of negligence causing the death of Jones. An excursion into the facts and circumstances of some other accident under different conditions at a different place would not have been relevant to the issues in this case, and would have tended to create confusion. Accordingly, the court properly excluded such evidence.

■ In submitting the case to the jury the court gave eighty-eight instructions, twenty-eight of which were proposed by the defendant. Of the remainder, twenty-one are put under the spotlight of error. It may well be that fewer instructions would have been preferable, and that in some instances language more in consonance with the peculiar circumstances of this case might have been chosen. We have examined all the instructions criticised, and also the rest of the instructions given; and when the instructions as a whole are considered, we believe that prejudice was not suffered by the defendant by reason of the particular instructions complained of. It is true that according to the record instruction number 45 is garbled by the use of the word ''plaintiff'' instead of ''defendant'' in the latter portion; but since throughout the instructions Jones was referred to either as the decedent or by his name, and since none of the plaintiffs was present at the time of the accident, we cannot believe that the jury was misled by the inadvertence. We pass the remaining instructions without special comment for the reason that several of them have already received approval in appellate decisions, and discussion of others would involve only repetition of what has

previously been said by us in regard to the legal principles applicable to the case.

Finally, the defendant insists that the verdict of $40,000 is a grossly excessive amount to be awarded as damages to the plaintiffs. At the time of his death, Mr. Jones was fifty-nine years of age and his wife forty-nine. His wages were $36 a week, and his expectancy of life was 14.74 years. He left surviving as his heirs his wife and eight children, three being minors, aged respectively fourteen, eleven and seven years; but only the wife and the three minors were dependent on him for support. Damages recoverable for the death of the head of a family are intended to be such as will fairly and reasonably compensate for the loss of benefits and advantages which are legally measurable in terms of money, and which the heirs might reasonably have expected to receive from the deceased, if his life had not been taken. In determining the pecuniary value of the loss, the earnings of the deceased, together with the reasonable expectation of life of one of his years, and the other elements entering into an award of damages, are to be considered in connection with the changes that normally come with advancing years and the fluctuations that ordinarily occur in the span of every human life. It is in the light of such considerations that appraisal is to be made by a jury of the present value in money of the loss sustained by the heirs of the deceased.

Mr. Jones was close to sixty; and as age creeps on, some loss of physical powers is to be expected, and employment is likely to be subjected to interruptions and to become less remunerative. Then again, a considerable proportion of the totality of the weekly earnings throughout the estimated period of expectancy of about fifteen years would have to be deducted to fix the present value at the time of death.

It is a delicate and difficult task to appraise the value of the life of the head of a family; but in view of the age and moderate earning capacity of the deceased and the other facts and circumstances disclosed by the evidence, the conclusion is forced upon us that an award of $40,000 is so disproportionate to reasonable compensation for the monetary loss sustained by the plaintiffs as to be explicable only on the ground that passion or prejudice was allowed to play a strong part in the rendition of the verdict.

Believing from a study of the record that the sum of $25,000 is the maximum that can fairly be allowed to plaintiffs, it is our conclusion that in justice to the defendant the judgment should be reduced accordingly.

The judgment is modified by reducing the amount thereof to the sum of $25,000; and as so modified the judgment is affirmed. The respondents shall recover their costs of appeal.

Knight, Acting P. J., and Cashin, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on June 30, 1932, and an application by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on July 28, 1932.

Langdon, J., did not participate.