[Civ. No. 12643. First Dist., Div. One. Sept. 21, 1944.]

EUGENE GEORGE OSTERTAG, a Minor, etc., Respondent, v. BETHLEHEM SHIPBUILDING CORPORATION (a Corporation) et. al., Defendants; BETHLEHEM STEEL COMPANY (a Corporation), Appellant.

Hadsell, Sweet & Ingalls for Appellant.

M. Mitchell Bourquin and A. Dal Thomson for Respondent.

DOOLING, J. pro tem.—Respondent, as plaintiff, recovered a judgment, on the verdict of a jury, of $10,000 for personal injuries. On August 20, 1941, respondent, while working with his back toward an electric crane operated by appellant's employee, was crushed between the crane and an upright steel beam in the plate shop of appellant. Respondent was an apprentice electrician employed by Buzzell Electrical Works and working with, and under the immediate direction of, one Schnipper, a journeyman electrician. Buzzell Electrical Works had a contract with appellant to make all the electrical installations in the plate shop. About seventeen or eighteen employees of Buzzell Electrical Works had been working in the plate shop for approximately two months before the accident. The plate shop was a fairly large building, about 240 by 40 feet in size. Running the length of this building were two rails or tracks about 30 feet above the floor, the respective rails being close to the north and south walls of the building. Upon these tracks ran an electrically driven crane which was used for lifting and carrying the heavy steel plates that were marked in the plate shop. This crane consisted of a steel beam on wheels, extending from rail to rail, with a driver's cab slung under the beam.

Most of the work done by the electricians in the plate shop had been the installation of heavy electrical cables near the ceiling and the electricians had been employed overhead in the plate shop at this work. On the day of the accident Buzzell's foreman had instructed Schnipper to take respondent to a position on the south wall of the building immediately above the rail on that side about 40 feet from the east end and install a length of electric cable there. The two got a ladder, put it up and made several trips up and down with their tools and equipment. Work had been suspended on the south wall for three days but men had been working on the north wall in the meantime. Neither Schnipper nor re-

spondent advised the crane operator or his hook tender, on this occasion, that they were going to work on the south wall, although on other occasions they had frequently been warned that men were working overhead. When Schnipper and respondent started to work they noticed the crane in operation at the west end of the building. There was testimony that the east end in which they were working had not been completed and was not in general use and respondent testified that he had never seen the crane operating in the east end of the building.

Respondent and Schnipper were installing a length of cable weighing about 40 pounds and they were using a chain tong weighing about 25 pounds. They worked facing one another and Schnipper directed respondent to take a position with his back to the crane. The crane was equipped with a foot bell similar to a streetcar bell and respondent was aware of this because he had given a "fellow a hand with putting on the bell up there."

The operation of the crane was directed by a hook tender who walked along the floor in front of it and signalled the crane operator. The crane operator's normal position was looking down at the hook tender to observe his signals. One of the duties of the hook tender was to look out for men working who might be injured by the operation of the crane. On the day in question neither of these persons observed Schnipper and respondent working overhead. It is claimed by appellant that the evidence shows that neither could see them, a question which we find it unnecessary to decide.

Respondent was compelled to work with one foot on the crane rail. He had been working about five minutes when Schnipper saw the crane approaching about five feet from respondent. Schnipper screamed and the crane operator stopped the crane but not until respondent had been crushed between the crane and an upright steel beam alongside which he was working.

Both Schnipper and respondent testified that they did not hear the foot bell on the crane sounded before the injury. The crane operator and the hook tender both testified that the bell was sounded. If the testimony will support the finding of the jury that the bell was not sounded, we are satisfied that it was a jury question whether the failure to sound the bell under the facts present was actionable negligence.

800

■ Ever since the decision of our Supreme Court in *Thompson* v. *Los Angeles etc. Ry. Co.*, 165 Cal. 748, 752 [134 P. 709], the courts of this state have consistently adhered to the rule therein announced that if a witness was in a position to be able to hear a warning signal, if one was sounded, and testifies that he heard none, such negative testimony is sufficient to support a finding that none was sounded although other witnesses testify positively to the contrary. (*Hamilton* v. *Pacific Elec. Ry. Co.*, 12 Cal.2d 598, 604 [86 P.2d 829] ; *Raynor* v. *City of Arcata*, 11 Cal.2d 113, 116 [77 P.2d 1054] ; *Young* v. *Pacific Electric Ry. Co.*, 208 Cal. 568, 572 [283 P. 61] ; *Keena* v. *United Railroads*, 197 Cal. 148, 154 [239 P. 1061].) Appellant argues that this rule should not apply to the case before us because respondent and Schnipper, who gave the negative testimony, were intent upon their work, were not consciously listening for the warning bell and were likely not to have heard it because of their position and the other noises present. We cannot say, as a matter of law, that by reason of any or all of these factors Schnipper and respondent would not have heard the bell if it had been sounded. The operator of the crane and his hook tender both heard the screams of respondent and Schnipper after the latter first observed the crane bearing down on them. The crane operator and hook tender were also intent upon their work, were surrounded by the same noises and were not listening for the screams. If the evidence will support the inference that the witnesses were in a position to hear the signal if given, the jury is entitled to draw that inference and, having drawn it, to give to their negative testimony preponderating weight. (*Peri* v. *Los Angeles Junction Ry.*, 22 Cal.2d 111, 118-9 [137 P.2d 441] ; *Lahey* v. *Southern Pacific Co.*, 16 Cal.App.2d 652, 661 [61 P.2d 461].) It is not irrelevant to observe further that while the crane operator and hook tender testified that the bell was sounded neither of them stated at what time or place this was done. The jury may well have concluded that even though their affirmative testimony was true, the bell might have been sounded only when the crane was leaving the other end of the building, some 150 or more feet from the scene of the casualty. ■ The question whether the crane operator with knowledge that electricians had been working overhead in the building for many weeks would be negligent in not continuing to sound the bell

as he propelled the crane to the eastern end of the building, which, according to the testimony of at least one witness had not been completed and was not yet in general use, was clearly one for the jury.

■ Appellant claims that respondent was guilty of contributory negligence as a matter of law and is also barred from recovery by voluntary assumption of the risk of injury. Respondent was a helper acting under the immediate direction of the journeyman Schnipper. At Schnipper's direction he was working with him in the place where he was injured. His work compelled him to assume a position with his back to the crane. The courts have often recognized that where a person must work in a position of possible danger the amount of care which he is bound to exercise for his own safety may well be less by reason of the necessity of his giving attention to his work than would otherwise be the case. (*Barboza* v. *Pacific Portland Cement Co.*, 162 Cal. 36, 40 [120 P. 767]; *Roddy* v. *American Smelting etc. Co.*, 34 Cal.App.2d 457, 460-1 [93 P.2d 841]; *Mecham* v. *Crump*, 137 Cal.App. 200, 203-4 [30 P.2d 568]; *Woods* v. *Wisdom*, 133 Cal.App. 694, 696-7 [24 P.2d 863]; *Jones* v. *Hedges*, 123 Cal.App. 742, 752 [12 P.2d 111]; *Driscoll* v. *California St. R. R. Co.*, 80 Cal.App. 208, 215 et seq. [250 P. 1062].) Whether or not respondent was guilty of contributory negligence on all the facts disclosed by the evidence was a jury question.

■ On the claimed assumption of risk this case is not unlike *Jones* v. *Hedges, supra,* where the argument was made that the decedent, a workman on the highway who was struck and killed by an automobile driven into a dense cloud of smoke caused by hot oil being sprayed upon the pavement by a road construction crew of which decedent was a member, had assumed the risk of such injury. This court, in the Jones case, pointed out that the decedent was in the performance of his duties under the direction of his foreman and held that "in a controversy between Jones or his heirs and a driver exercising ordinary care, Jones might be regarded as having assumed the usual risks incident to his employment; but he cannot be held to have assumed the risk of death through the *negligent propulsion* of an automobile upon him." Indeed it is unthinkable that· a workman performing services for an independent contractor on the premises of another,

under the direction of his superior and at the place where such services under the contract must necessarily be performed, should be held to have assumed the risk of injury by the negligent act of the owner of the premises or of the owner's agent or employee. As stated in *DeGraf* v. *Anglo California Nat. Bank*, 14 Cal.2d 87, 99-100 [92 P.2d 899]:

"But, even conceding the applicability of the doctrine of 'assumed risk' to the instant case, it is clear, with reference thereto that the determinative question was whether, in consideration of all the circumstances, plaintiff conducted himself as a reasonable and prudent person."

The refusal of the court to give appellant's proposed instructions on assumption of risk was proper under the facts of this case.

█ Appellant proposed certain instructions to the effect that respondent had no right to rely upon the care of Schnipper and could not delegate his duty to exercise ordinary care for his own safety to Schnipper. The refusal to give these instructions was not error. The only evidence pointed out by appellant to which the proposed instructions are claimed to be applicable is that of respondent that he, respondent, did not tell appellant's floor man that he was going to work in the place where he received his injury "because it was up to my boss to do that. I just took orders." Respondent was an apprentice working under the journeyman, Schnipper. Assuming that it was negligence for Schnipper to fail to advise the floor man that they were starting to work in that particular place it was not shown that respondent knew that Schnipper had not done so; and at least in the absence of such knowledge no duty was cast on the subordinate apprentice to inform the floor man or anybody else that he was going to work where his superior directed him. If the duty of giving such notice was cast on every subordinate employee, much of their working time would be taken up by every individual separately conveying such information to the owner of the premises on which the work was being performed or to his agents. The law can hardly contemplate such an absurdity of conduct. █ The trial court correctly instructed the jury, instead, that the negligence of his employer, or other servants of his employer, could not be imputed to respondent. (*Hubbard* v. *San Diego Elec. Ry. Co.*, 201 Cal. 53 [255 P. 508]; *Lagomarsino* v. *Market Street Ry. Co.*, 202 Cal. 474,

477 [261 P. 465]; *Bryant* v. *Pacific Electric Ry. Co.*, 174 Cal. 737, 739-40 [164 P. 385]; *Sichterman* v. *R. M. Hollingshead Co.*, 94 Cal.App. 486, 488 [271 P. 372, 1111]; *Handley* v. *Lombardi*, 122 Cal.App. 22, 28-31 [9 P.2d 867]; *Moreno* v. *Los Angeles Transfer Co.*, 44 Cal.App. 551, 556 [186 P. 800].)

The court gave an instruction in the language of Civil Code, section 1708. An instruction that "Every person is bound, without contract, to abstain from injuring the. person or property of another" standing alone, might, as contended by appellant, be construed by the jury as imposing an absolute liability upon appellant for injury to respondent by the operation of its crane. However, the jury was fully instructed on negligence, contributory negligence and proximate cause, and was specifically instructed that before the plaintiff could recover it must appear that defendant or its servants were guilty of some act of negligence or willful misconduct which contributed proximately to the accident and that if the jury found that the defendant or its servants were not guilty of negligence which contributed proximately to the accident they would have no occasion to consider the question of damages. The jury was also instructed not to single out any particular instruction, but to .consider the instructions as a whole. Taking all the instructions together, the jury cannot have been misled by the instruction in the language of Civil Code, section 1708.

Appellant complains of an instruction that the burden of proving contributory negligence was on the defendant because of the omission therefrom of the words "unless it is established by plaintiff's own case" or words of similar import. In the absence of a request by appellant for an instruction containing such qualification it was not error to give the criticized instruction. (*Blanton* v. *Curry*, 20 Cal.2d 793, 804-5 [129 P.2d 1]; *Daniel* v. *Asbill*, 97 Cal.App. 731, 738-9 [276 P. 149].)

Appellant's claims that the verdict of $10,000 is excessive, and that the court erred in instructing the jury that they should take into consideration in estimating the damages whether the injuries were temporary or permanent and have impaired the power of the plaintiff to earn money in the future, may well be considered together.

Respondent at the time of his injury was nineteen years of

age, with an average life expectancy of 42.87 years. (American Experience Table of (Insured) Mortality, 41 C.J. 216.) He was crushed between the crane and a steel upright. A pair of pliers in his right hip pocket was driven into his body, leaving lacerated tears in one of his buttocks and on the anal orifice. There is permanent scar tissue in the left buttock from this laceration which has left the muscles in that buttock not as well developed as in the right. The laceration of the anal orifice resulted in pain during evacuation of the bowels, but, at the time of trial, a little more than two years after the injuries were received, this condition, although still present, had considerably improved. Respondent sustained a fracture of the left pubic bone and that bone was depressed downward and the opening between the pubic bones, the symphysis pubis, was widened. Respondent was in the hospital over seven weeks with weights on his feet. During the first five weeks he suffered severe pelvic pains, and pain extending to his knees. After his discharge he spent another seven weeks at home, most of the time in bed. When he finally returned to work he was given lighter work, and, after two months, was taken from outside work and moved into the shop where he was set to repairing motors.

He was inducted into the Army on January 6, 1943. Marching caused him so much pain that, after X-rays were taken, he was given a medical discharge less than a week from his induction. Dr. Cline examined respondent about a year after his injury, and a second time after another year. On both occasions he found a greater than normal separation in the symphysis pubis with the left pubic bone depressed. He testified that the continued separation of the pubic bones and the distortion of the left side downward places an abnormal strain on the sacroiliac. Between his first and second examination by Dr. Cline respondent had developed a lateral curvature of the spine, or scoliosis. Dr. Cline attributed this to an attempt to compensate for the distortion of the pelvic ring with its attendant pain. In this he was corroborated by appellant's medical witness who testified: "The patient compensates for that by leaning away from the part that hurts him."

After respondent has been working for a couple of hours, the front bones of his pelvis and his back begin to ache, mak-

ing it necessary for him to sit down and rest. After sitting for a time, a pain develops in his coccic region, although this latter condition has improved. Between the first and second examination by Dr. Cline, respondent had developed a tenderness over the sacroiliac joints. Respondent's special damages were $1,308, leaving approximately $8,700 of the award attributable to general damages.

In considering the claim that the verdict is excessive we are bound by the established rules recently restated by the Supreme Court in *Deevy* v. *Tassi*, 21 Cal.2d 109, 120-121 [130 P.2d 389], that an appellate court will not set aside a verdict unless it "is so grossly disproportionate to any reasonable limit of compensation warranted by the facts as to shock the sense of justice and raise at once a strong presumption that it is based on prejudice or passion rather than sober judgment" and the question of excessive damages being primarily for the decision of the trial judge on motion for new trial, his denial of a new trial on that ground is persuasive on appeal that the verdict is not excessive.

Appellant's main contention is that the evidence is not sufficient to support a finding of permanent disability or of impairment of future earning power. Over two years after the injury, respondent had a pubic ring depressed on the left side with an abnormal widening of the symphysis. Because of pain resulting from this condition he had a leftward curvature of the spine. Appellant's own medical witness testified that at the time of trial the bone injuries had healed so that "the pelvis ring is good and solid." It is a matter of common knowledge that a distortion in the bony structure of the body once union and healing is complete will not ordinarily correct itself.

Dr. Cline in answer to a question as to his prognosis of what the future holds for respondent said:

"I cannot say positively what this boy's future is, but in view of the fact he has had the development of the sacroiliac symptoms in the course of the past year and the fact they have become somewhat more severe since their development, and the fact he has a disturbance of the anatomy which has disturbed the function of the sacroiliac joints, I think it is reasonable to assume he is going to have trouble with them in the future. Just how much, I don't know. Just what the

course of that trouble will be, I don't know. I would be a little bit inclined to think he would have more trouble in the future than he has at the present time, but he is a young man and there are certain compensations that can take place in muscle strength, that sort of thing. It may be that he will improve some. On the other hand, I think the changes will build up as age takes place and he is apt to have some trouble.''

Dr. Sale, appellant's medical witness, testified that ''There is some displacement'' in the symphysis pubis and that one side of the pubic ring is lower than the other ''because the fracture is healed in front with one side slightly lower than the other, but it is solid.''

Appellant points to the rule stated in *Melone* v. *Sierra Railway Co.*, 151 Cal. 113 [91 P. 522], and frequently reiterated since, that prospective damages are recoverable only when they are certain to result in the future, and argues that there is no basis in the evidence for a finding that any such future damages are reasonably certain to occur. The question is not a new one in this state and testimony no stronger has in several cases been held sufficient to support a finding of future damages with reasonable certainty. In *Kimic* v. *San Jose-Los Gatos etc. Ry. Co.*, 156 Cal. 273, 278 [104 P. 312], the Supreme Court said:

''Of the physicians called by plaintiff as witnesses, one testified that a shock to the nervous system, producing neurasthenia, might result from an injury similar to the one suffered by plaintiff. He was unable to state whether any permanent effect had been produced in this case. Another expressed the opinion that the injuries would probably be permanent. A third that, in his opinion, Kimic was, at the time, suffering from neurasthenia, which the witness declared to be a progressive disease, and one that could be caused by the shock of railway injury. In old age the probabilities, the witness stated, were 'rather against a recovery.'

''In the face of this testimony, it cannot be successfully urged that the jury were not warranted in finding that there was a 'reasonable certainty' . . . that plaintiff's injuries had permanently affected his nervous system. . . .''

The holding in *Cordiner* v. *Los Angeles Traction Co.*, 5 Cal. App. 400, 402-5 [91 P. 436], is succinctly summarized in *Oli-*

*veira* v. *Warren,* 24 Cal.App.2d 712, 715-6 [76 P.2d 113] as follows:

"The doctors there in conservative language expressed it as their opinion that a brain injury sustained by the plaintiff might produce convulsions and paralysis, and that there was a danger of mental deterioration. The court held that such testimony tended to prove the ultimate fact, that is, the reasonable certainty that future evil consequences would result from the injury, and that it was for the jury to weigh and determine its value as proof."

In *Riggs* v. *Gasser Motors,* 22 Cal.App.2d 636, we find at page 640 [72 P.2d 172]:

"Appellants rely upon the fact that no witness testified absolutely that future results were certain to occur, but only gave their opinions as to what might and might not occur. We take it that it is the province of the jury to determine from testimony whether the injuries are such that future detriment is certain to occur, or rather, may be shown by the testimony to be so reasonably certain to occur as to be considered by the jury in determining the damages to be awarded." (*Cf. Sundberg* v. *Ringel,* 100 Cal.App. 545, 549-50 [280 P. 557]; *Ward* v. *DeMartini,* 108 Cal.App. 745, 748 [292 P. 192]; *Parsell* v. *San Diego Consol. G. & E. Co.,* 46 Cal.App.2d 212, 216 [115 P.2d 539].)

The rule to be drawn from the foregoing cases is that from expert testimony as to the medical probabilities it is for the jury to determine whether future detriment is reasonably certain to occur in the particular case.

On the question of loss of earning power appellant points up the testimony that respondent's wages at the time of his injury were $3.75 per day and at the time of trial he was receiving $6.00 per day. This is not conclusive that respondent's future earning power has not been diminished by his injuries. A man with his physical impairment might have no difficulty in obtaining or retaining lucrative employment during the present war time labor shortage and yet find himself handicapped in that regard when our economy returns to normal peace time conditions. The question was one for the jury's determination. The "damages may be estimated upon *one's ability to earn money,* rather than upon what one is either earning or has actually theretofore earned."

(*Hosman* v.: *Southern Pacific Co.*, 28 Cal.App.2d 621, 634 [83 P.2d 88].)

We are satisfied that the verdict should not be reversed as excessive and that it was not error to give the instructions on permanent injury and impairment of earning power.

The judgment is affirmed.

Peters, P. J., and Ward, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied November 16, 1944.