[Civ. No. 22716.   Second Dist., Div. Three.   July 25, 1958.]

RAYMOND ARTHUR KITE, Respondent, v. COASTAL OIL COMPANY, Appellant.

338

Spray, Gould & Bowers for Appellant.

Earl A. Barnes for Respondent.

NOURSE, J. pro tem.*—This is an action to recover damages for personal injuries. Defendant appeals from a judgment based upon the verdict of the jury awarding plaintiff the sum of $58,000.

*Assigned by Chairman of Judicial Council.

The facts:

Defendant is owner of an oil well in the city of Signal Hill. The day of the accident in question a pumping or sucker rod in the well casing had broken. Upon discovering the break, defendant's vice president and production superintendent called Oil Well Service Company (hereinafter called Oil Well) requesting that they repair or replace the broken rod. Oil Well responded by sending a repair crew of four men to defendant's premises.[1] The plaintiff was one of the members of this crew. The foreman of the crew was one Miller. Oil Well had been employed by defendant to service the well in question on a number of occasions over a period of several years and Miller had been instructed not to "rock" the well.

In order to do the repair work, it was necessary that the service crew detach the upper end of the pumping rod from the outer end of the walking beam which activated it. This walking beam was pivoted near its center on a vertical pole called the Simpson pole and the inner end was attached by means of a rod called the "Pittman arm" to an activating device which consisted of certain gears and a counterweight, which were in turn activated through a belt by a gasoline motor. The upper end of the Pittman arm rested in what is termed "the tail bearing assembly." This assembly consisted of a bearing on which the stirrup of the Pittman arm (a shaft connecting the two ends of the bridle which the upper portion of the arm consisted of), rested and over which was a cast iron cap which was designed to be secured by four bolts. When the Oil Well crew arrived at the well, the inner end of the walking beam was at its greatest height from the ground and the counterbalance was at the top of its cycle. In order that the broken pumping rod might be pulled from the well casing, it was necessary to have the walking beam disconnected from both the upper end of the pumping rod and from the activating machinery. In order to disconnect the walking beam from the activating machinery, the plaintiff caused the counterbalance, while still connected to the Pittman arm, to be lowered so that it was at the point nearest the ground in its cycle.[2] After the broken pumping rod had been repaired,

---

[1] It is conceded that Oil Well acted as an independent contractor and that the repair crew were its employees and not the employees of defendant.

[2] There was a conflict in the evidence as to whether he performed this operation against the orders of his foreman or as to whether it was necessary to lower the counterbalance in order to disconnect the Pittman

the service crew proceeded to attempt to put the well back in operation. In order to do this it was necessary to reconnect the pumping rod and the Pittman arm to the walking beam. This could be done in one of two manners. First, by connecting the Pittman arm to the counterbalance at its lower position and then by the use of certain tackle, pulling the pumping rod to a height where it could be connected to the walking beam. This operation would not require the use of the gasoline engine or any movement of the walking beam or the Pittman arm. The second method was to lower the outer end of the walking beam to where it could be connected with the pumping rods and then by rocking the counterbalance raise it to its vertical position where it could be connected with the Pittman arm. The service crew chose the second method.

This rocking operation was performed substantially as follows: By the use of the engine, the counterbalance was raised as high as possible and then allowed to drop free and swing in a pendulum fashion and when it started to swing back, power was again applied so as to raise it farther at the top of its swing, the purpose being to gradually bring it to a vertical position. While attempting this operation the cap on the upper half of the tail assembly broke; the Pittman arm was thus caused to fall and strike the plaintiff, causing him serious injury. Defendant's production manager witnessed the rocking operation and voiced no objection to it.

The evidence showed without conflict that no force was applied to the cast iron cap during the normal pumping operation of the well but that upon the breaking of the pumping rod, a heavy blow would be struck against the cap by the stirrup. The evidence was in conflict as to what force was applied to the cap through the rocking operation, but there was evidence that if the rocking operation were properly performed the stirrup would not be caused to strike against the cap and that the operation could be performed with the cap off without causing the Pittman arm to be disconnected from the walking beam and fall.

There was substantial evidence to prove that one of the four bolts that secured the cap at the tail assembly and which held the Pittman arm in place on the upward thrust of the arm, was missing and had been for some time; that one bolt was not secured by a nut and that another permitted about

arm. But it was undisputed that if the counterbalance had been left in the position at which it was found by the repair crew, it would have been unnecessary to have performed the rocking operation herein described.

⅜ of an inch play; that if three bolts on the cap had been secured, it would have withstood any upward thrust placed upon it by the rocking motion.

There was evidence that the cap was visibly loose and that this condition was noticed by certain of the crew although the plaintiff denied noticing it; that the rocking operation was known to be dangerous and that plaintiff, who at the time of the accident was operating the clutch, stood in a position known to be dangerous although he might have stood in a safe position. To the contrary, there was evidence that less than 30 days prior to the accident, the entire pumping equipment had been overhauled and inspected and at that time there were no loose or missing bolts in the tail assembly and that it was the duty of the employees of the defendant to each day inspect all bolts and tighten all loose ones.

The evidence was in conflict as to whether plaintiff was the one who performed the rocking operation and as to whether or not he had been instructed by his foreman not to do so. It is undisputed that at the time of the accident plaintiff was standing on the ground directly in line with the Pittman arm and operating the clutch on the engine so as to give impetus to the swing of the counterweight in its pendulum movement. The issues submitted to the jury were negligence of the defendant, contributory negligence of the plaintiff and damages.

During the deliberations of the jury, the trial judge advised counsel that the bailiff had informed him that the jury was ready to return a verdict but they were not agreed upon the amount of the verdict and that he intended to poll the jury on two separate questions: a. The question of liability and b. the question of damages. Thereupon counsel for the defendant objected to that procedure and the trial judge stated that he would first poll the jury on the general verdict and that if the required number did not respond to that verdict, he would poll the jury separately upon the questions above noted. To this procedure, counsel for the defendant again objected. Thereupon the jury was returned to the courtroom and a verdict signed by the foreman was handed to the clerk. After this was read to the jury, the jury was polled as to whether or not the verdict as read was their verdict. Upon this poll, jurors 1, 2, 5 and 12 replied in the negative. The remaining jurors replied in the affirmative. The court then polled the jury as to whether they found against the defendant upon the issue of liability. Upon this poll, jurors 1, 2 and 5 answered in

the negative. After this poll was taken the court stated: "Now will you poll them as to amount.

"Regardless of how you may have voted on the issue of liability we want to know if this is your verdict as to amount."

■ Upon this poll, jurors 5 and 12 voted in the negative. It is evident from the facts we have just recited that the jury did not reach a verdict.

Under section 7 of article I of the Constitution of this state, a verdict may not be rendered in a civil action by less than three-fourths of the jury. Section 618 of the Code of Civil Procedure provides in part as follows: ". . . Either party may require the jury to be polled, . . . *If upon such inquiry or polling, more than one-fourth of the jurors disagree thereto, the jury must be sent out again, . . .*" When in the present case, four of the jurors upon the poll taken on the general verdict, declared that it was not their verdict, it was clearly the duty of the trial court to send them back for further deliberations and we know of no procedure which authorized him to, in open court, take what amounted to special verdicts upon the issues submitted to the jury. However, in the present case, the result of the second two polls merely confirmed the first. Jurors 1, 2 and 5 stated that they did not find the defendant liable. Necessarily this included a finding by them that the plaintiff was not entitled to any damages. Upon the poll of the jury as to the issue of damages, juror number 12 joined with jurors 1, 2 and 5 and stated that the verdict as read was not his verdict. The result is that under any view of the matter, only eight jurors had agreed upon the verdict as signed by the foreman and hence there was no true verdict.

■ Throughout the briefs here and apparently in the trial court, defendants have taken the position that the service crew were called upon to repair the entire pumping apparatus of the well in question and that as the tail assembly, the breaking of which permitted the Pittman arm to fall and strike the plaintiff, was part of that equipment, the rule that an owner must furnish an independent contractor a safe place to work does not apply. This contention is unsound. In the first place, Oil Well was not employed and did not undertake to repair any part of the pumping equipment except the broken pumping rod. They were not called upon to do any repair work upon any other part of the equipment. In the second place, under the facts here, there is no question as to the safe condition of the premises. It was not necessary for

the repair crew to use defendant's engine or machinery and unless it was used, the premises were safe. The decision relied upon by defendant that holds that an invitee who enters premises under construction or repair, accepts those premises in the condition they then are, has no application for it is not the law of invitor or invitee that applies here, but that of bailor and bailee, and the rights of the plaintiff and the obligations of the defendant are governed by the laws applicable to bailments and not by those governing invitor and invitee.

As we have heretofore pointed out, it was not necessary for the repair crew to use defendant's actuating machinery to accomplish the work. When they chose to use the actuating machinery for the purpose, Oil Well became the bailee of this equipment. If the use of the machinery was solely for their benefit, the transaction was a loan and the defendant's duties were fixed by section 1893 of the Civil Code, (see also 8 C.J.S. Bailments, § 25; 6 Am.Jur., p. 308, § 193) and it was obligated to reveal any defects or devices in the equipment which were known at the time of the borrowing. If it was for the mutual benefit of defendant and plaintiff, it was the duty of the defendant to use reasonable care to ascertain that the equipment was safe and suitable for the purposes for which it permitted its use by Oil Well. (Civ. Code, § 1955; *McNeal* v. *Greenberg*, 40 Cal.2d 740, 742 [255 P.2d 810]; 6 Am.Jur. 310 § 195.)

The evidence here was subject to two interpretations under one of which the bailment would have been a gratuitous one for the sole benefit of Oil Well and under the other of which it would have been a bailment for the mutual benefit of both Oil Well and defendant. If the jury believed that the rocking procedure was used by Oil Well solely as a short-cut in performing its work of putting the well back in operation, then it was a gratuitous loan or bailment for its sole benefit. If the jury believed that the well was rocked without the consent and contrary to the directions of defendant, as testified to by the foreman of Oil Well repair crew, then, of course, defendant owed no duty to Oil Well or the members of its crew. If however, the rocking procedure was with the consent of the defendant and was for the benefit of both defendant and Oil Well, then the bailment was one of mutual benefit.

Plaintiff, having proved that the Pittman arm was caused to fall by the breaking of the tail assembly, and there being evidence that there was a defect in that assembly which existed prior to its use by the repair crew, the plaintiff was

entitled to a proper instruction on res ipsa loquitur, for if the defect existed prior to the repair crew taking possession of the machinery and putting it to use, the assembly was then in the exclusive possession of defendant. (*Zentz* v. *Coca Cola Bottling Co.*, 39 Cal.2d 436 [247 P.2d 344].) The instruction[3] given by the court, however, was erroneous.

In order that an inference that defendant was negligent and that his negligence was the proximate cause of an accident, may be drawn from evidence of the occurrence of an accident, three conditions must exist. "(1) the accident must be of a kind which ordinarily does not occur in the absence of someone's negligence; (2) it must be caused by an agency or instrumentality within the exclusive control of the defendant; (3) it must not have been due to any voluntary action or contribution on the part of the plaintiff." (*Ybarra* v. *Spangard*, 25 Cal.2d 486 at 489 [154 P.2d 687, 162 A.L.R. 1258]; *Salgo* v. *Leland Stanford etc. Board Trustees*, 154 Cal.App. 2d 560, 571-572 [317 P.2d 170].) It is only where there is no issue of fact as to the existence of any of these conditions that the court may, as the court did here, direct the jury to draw the inference. (*Seneris* v. *Haas*, 45 Cal.2d 811 at 823 [291 P.2d 915, 53 A.L.R.2d 124]; *Roberts* v. *Bank of America*, 97 Cal.App.2d 133 at 137 [217 P.2d 129]; *Salgo* v. *Leland Stanford etc. Board Trustees, supra*; *Rodin* v. *American Can Co.*, 133 Cal.App.2d 524 [284 P.2d 530].) If the existence of any condition is one of fact it is the province of the jury to determine whether the inference of negligence should be drawn from the facts proved. (Code Civ. Proc., § 1958.)

The existence of the first and of the third of the conditions mentioned above, was in the present case a question of fact to be determined by the jury. There was evidence that on other occasions tail assemblies of the kind used by the defendant had broken even though firmly bolted in place, and

---

[3] "From the happening of the accident involved in this case as established by the evidence, an inference arises that the proximate cause of the occurrence was some negligent conduct on the part of the defendant. That inference itself is a form of evidence, and if none other exists tending to overthrow it, or if the inference, either alone or with any other evidence supporting it, preponderates over contrary evidence, it warrants a verdict for the plaintiff. Therefore, you should weigh any evidence tending to overcome that inference, bearing in mind that it is incumbent upon the defendant to rebut the inference by showing that it did, in fact, exercise ordinary care and diligence or that the accident occurred without being proximately caused by any failure of duty on its part."

by reason of the exertion of unusual force against the casting. There was evidence that in a rocking operation unusual force is always exerted against the cap although there was also evidence that this unusual force was only exerted against the cap when the rocking operation was improperly performed; and the evidence was undisputed that the plaintiff was handling the clutch on the engine and was thus in control of the rocking operation. From this evidence the jury might have found either that the accident was one which might ordinarily occur in a rocking operation, without negligence on the part of the defendant, or that there was voluntary action on the part of the plaintiff contributing to the accident, or found that neither of the first or third conditions existed. Under the instruction given by the court, all of these matters of fact were taken from the jury and they were instructed to draw the inference.

▮ The error we have just pointed out in the instruction, was not cured by the instruction given by the court in the form of BAJI 206-C. That instruction does not permit the jury to determine the issues of fact that we have mentioned, but merely explains to the jury the reason for the court's instructing them to draw the inference.

▮ The instruction given is erroneous in a further particular, for by it the jury were told that if the inference alone, or with other evidence preponderated over evidence to the contrary, it *warranted a verdict* for the plaintiff. It thus ignored the defense of contributory negligence and there was ample evidence to support this defense. By the instruction the jury should have been told that if the inference alone or with other evidence preponderated over evidence to the contrary it warranted a finding that the defendant was negligent.

▮ The court in instructing the jury, read to them section 6630, tit. 8, of the Administrative Code, which contains a regulation adopted by the Division of Industrial Safety dealing with the construction, installation and maintenance of oil well pumping machinery.[4] It instructed the jury that if any party to the action conducted himself in violation of the provisions of this section of the Administrative Code, such conduct constituted negligence as a matter of law. The court erred in

---

[4] "Construction, Installation and Maintenance (a) Oil well pumping machinery shall be substantially constructed to conform to good engineering practice and shall be kept in good repair. (b) The machinery shall be so installed and secured in place to withstand the stresses imposed under normal operating conditions."

giving this instruction. In the first place, there was no evidence to which any portion of the code section read to the jury was applicable, except the portion thereof which required that oil pumping machinery be kept in repair. In the second place, the instruction placed a duty upon defendant as to the plaintiff, greater than any which was imposed under the facts in the present case. Under any view of the evidence, the highest duty that could have been placed upon the defendant was to use ordinary care to keep its equipment in repair and to discover any defect in it and to warn the repair crew of that defect.

The instruction given made it the absolute duty of defendant to keep its machinery in repair and made it liable even though it used ordinary care in performing its duty to repair. It was for the jury to determine from all of the evidence whether the defendant had breached its duty, and the mere fact that the tail assembly was out of repair, did not in and of itself, establish a breach of that duty. This case is to be distinguished from *Armenta* v. *Churchill*, 42 Cal.2d 448 [267 P.2d 303]. In that case the safety order involved required the performance of a specific act, the sounding of a horn by the defendant while backing his truck. In the present case the order does not require the doing of any specific act and the duty that was cast upon defendant, as has been pointed out, was to use reasonable care to discover the defect and to repair it. Unless the defendant breached this duty, it was not negligent. (*Copfer* v. *Golden*, 135 Cal.App.2d 623 at 634 [288 P.2d 90].)

The defendant requested, but the court refused to give an instruction to the effect that the mere fact that the accident happened, would not show that anyone was negligent. Inasmuch as the plaintiff was not entitled to an instruction on res ipsa loquitur, unless the jury found the existence of the conditions which give rise to that inference, the defendant was entitled to the instruction refused. (*Barrera* v. *De La Torre*, 48 Cal.2d 166 at 170-172 [308 P.2d 724].)

The defendant requested, but the court refused to give instructions in the form of BAJI 207, 207-C and 207-D[5]

---

[5] "'We have a legal principle commonly referred to by the term 'assumption of risk.' It now will be explained to you: A person is said to assume a risk when he freely, voluntarily and knowingly manifests his assent to dangerous conduct or to the creation or maintenance of a dangerous condition, and voluntarily exposes himself to that danger, or when he knows that a danger exists in either the conduct or condition of another, or in the condition, use or operation of property, and voluntarily places himself, or remains, within the area of danger. A person who thus

dealing with legal principles of assumption of risk. To the contrary, the court instructed the jury that the plaintiff did not assume the risk of any injury that could have come to him only through the negligence of the defendant.[6] The court erred in denying the requested instructions and in giving the instruction above noted.

A person assumes a risk when he knows that a danger exists in the condition, use or operation of property and voluntarily places himself in an area of danger, having had the opportunity to do the work from a safe place or to do it in a manner which would avoid the risk. Where there is evidence from which the jury can find the existence of all of these elements, the defendant is entitled to have the jury instructed upon the legal principles we have set forth.

In the present case, there was evidence from which the jury could find that:— Plaintiff was an experienced oil well worker; he knew that rocking a well was a dangerous operation; he knew that the place at which he chose to do his work was one where, if the Pittman arm fell, he would be in its path; he could have done his work from a safe position upon the platform; the operation of rocking the well placed extraordinary strain upon the cap of the tail assembly; the tail assembly was "sloppy and loose"; this condition was seen by another member of the repair crew; plaintiff at times during the operation, stood in a position where he had a full view

assumed a risk is not entitled to recover for damage [caused him without intention and] which resulted from the dangerous condition or conduct to which he thus exposed himself.

"Your attention is called to a distinction between contributory negligence and assumption of risk. As said elsewhere in these instructions, an essential factor in contributory negligence is that it be a proximate cause of the injury of which a person thereafter complains. But assumption of risk, if it meets with the requirements of the law as stated to you, will bar recovery for damage although it plays no part in causing the accident except merely to expose the person to the danger.

"In determining whether or not a person had knowledge of a dangerous situation and whether, with such knowledge, he assented to or assumed a risk so as to bar recovery by him of damages for injury, you may consider his age, experience and capacity along with all the other surrounding circumstances as shown by the evidence. When we are concerned with a question as to the possible knowledge that may have existed in the mind of another person at a certain time, we must, of necessity, look to the indirect evidence, unless he has admitted having such knowledge, and we may draw from that evidence whatever inferences our judgment directs to be reasonable."

6"'I instructed you that the plaintiff Raymond Arthur Kite did not agents or employees.'' (BAJI 207-E.)
assume the risk of any injury that could have come to him only through the negligence of the defendant Coastal Oil Company or said defendant's

of the tail assembly and if he had looked, would have seen its condition as observed by his coworker. From this evidence the jury could have found that plaintiff, despite his testimony that he did not look at the tail assembly, did look at it; that he observed its defective condition and that he voluntarily chose to stand in a position of known danger rather than in a safe position upon the platform, and that he thus assumed the risk of the tail assembly giving way during the rocking operation. Defendant was therefore entitled to instructions on the assumption of risk which it requested.

The instruction given (BAJI 207-E) while proper under some facts, was erroneous under the facts here. In *Prescott v. Ralphs Grocery Co.*, 42 Cal.2d 158 [265 P.2d 904], the Supreme Court in holding that the trial court properly refused an instruction which was substantially in the form of that given here, said at page 162: "We cannot agree, however, that the court erred in refusing any of the instructions requested by plaintiff. In the first of these instructions the court was asked to tell the jury that 'You are instructed as to the doctrine of assumption of risk that the law is, that while a person assumes the perils which are naturally incident to the position he has taken, *he does not assume dangers which come only from the negligent act of another.*' (Italics added.) As we have seen, the elements of the defense of assumption of risk are a person's knowledge and appreciation of the danger involved and his voluntary acceptance of the risk. It follows that a person, if he is fully informed, may assume a risk even though the dangerous condition is caused by the negligence of others. (Citations.) Indeed, the cases in which this defense is applied usually involve dangerous conditions created by the negligence of another. The requested instruction was erroneous, and the trial court was not under a duty to revise it to state the law accurately.'"[7]

The judgment is reversed.

Shinn, P. J., concurred.

WOOD (Parker), J.—I concur in the judgment and in the part of the opinion which is to the effect that the jury did

---

[7]The Supreme Court, in the cited case, expressly overruled *Jones* v. *Hedges*, 123 Cal.App. 742 [12 P.2d 111], which is relied upon by the editor of BAJI as authority for the instruction here given by the court. *Ostertag* v. *Bethlehem etc. Corp.*, 65 Cal.App.2d 795 [151 P.2d 647], which was also cited by the editor, is based upon *Jones* v. *Hedges, supra.*

not return a verdict. That part of the opinion was a sufficient disposition of the appeal.

In my opinion, the declarations of this court regarding various additional questions as to bailment, assumption of risk, res ipsa loquitur, and certain instructions are not necessary or appropriate on this appeal and will tend to restrict the trial judge, upon the retrial, in declaring the law. It might well be that the evidence upon the retrial will be substantially different from the present evidence. In any event, it is reasonable to believe that the retrial judge will be confronted with conflicting claims regarding the applicability of the doctrine of "law of the case"; and that he will have the additional burden of comparing the evidence in the first trial and in the retrial for the purpose of determining whether the doctrine is applicable. Under the circumstances of this case, the retrial judge should be free to declare the law, in the light of the most recent decisions available at the time of trial, without being required to compare the evidence in the two trials to determine whether he is bound by the several declarations of law as stated on this appeal.

A petition for a rehearing was denied August 19, 1958, and the following opinion was then rendered:

WOOD (Parker), J.—I would deny a rehearing and would modify the main opinion by deleting the portions which are referred to in my concurring opinion as being unnecessary on this appeal.

Respondent's petition for a hearing by the Supreme Court was denied September 17, 1958. Gibson, C. J., Carter, J., and Traynor, J., were of the opinion that a hearing should be granted.