[Civ. No. 25796.   Second Dist., Div. Four.   Jan. 18, 1963.]

ORVILLE LITLE, Plaintiff and Appellant, v. R. G. LE-
TOURNEAU, INC., et al., Defendants and Respondents;
HARDWARE MUTUAL CASUALTY COMPANY, In-
tervener and Appellant.

James G. Butler for Plaintiff and Appellant, and Intervener and Appellant.

Kennedy & Kennedy, Richard V. Kennedy, Boehler & Dwyer and Edwin C. Boehler for Defendants and Respondents.

BURKE, P. J.—This action was brought by plaintiff Litle for damages for injuries received from a collision while he was operating a piece of heavy earth moving equipment commonly called a "tournapull" in the course and scope of his employment. Plaintiff alleged as a first cause of action that R. G. LeTourneau, Inc. (LeTourneau) had negligently designed and manufactured the tournapull involved in the accident causing plaintiff's injury. As a second cause of action plaintiff alleged that Bill A. Jaehn (Jaehn), an employee of plaintiff's employer, negligently failed to maintain, inspect, supervise and keep the tournapull in good repair causing plaintiff's injury.

The trial court held that both LeTourneau and Jaehn were negligent; that plaintiff was not contributorily negligent but that in each instance plaintiff had assumed the risk and voluntarily exposed himself to the dangers which caused the accident.

The evidence in this case disclosed the following pertinent facts. Plaintiff worked for Post Bros., his employer from February 8, 1956, to October 1956, as an operator of heavy equipment. On the day of the accident plaintiff was working for the first time on a job at Dana Point, California. Plaintiff worked all morning with a different tournapull than the one involved in the accident, making a trip up and down the hill every 15 minutes. He was engaged in a cut and fill operation, cutting at the top of a hill and filling at the bottom. There were two hills that he had to traverse, the first leading to a flat surface and the second being the main hill down to the place of the fill. The grade of the first hill was about 15 to 20 degrees and the second about 26 degrees. Plaintiff had

operated on grades of this kind before. He traveled at approximately 8 to 10 miles an hour as a normal speed. When starting down the hill plaintiff would lower his pan or scraper leaving only about 3 inches clearance above ground level.

Plaintiff had some trouble with the bull gear on one tournapull in the afternoon and he took over tournapull No. 62, the one involved in the accident. Before driving tournapull No. 62 plaintiff discussed its condition with defendant Jaehn, employer's chief maintenance mechanic who told him that it was in "A-1" condition.

Plaintiff started the motor of No. 62 and let it run until air pressure built up. When the pressure reached 65 pounds per square inch he raised the pan or scraper and started for the cut. Plaintiff checked the pressure at the cut and had a little over 100 pounds. He customarily operated at 100 to 120 pounds pressure. He loaded his pan and started down the first grade at about 8 to 10 miles per hour in second gear. He continued at 8 to 10 miles per hour on the level between the two grades. When he left the black top road and straightened up he saw a water truck parked ahead of him on the road, approximately 200 feet away. When he saw the truck he put his foot on the brake. His brake pedal went to the floor. He then put his machine in first gear but found it inoperative. He then tried to lower his pan as a braking device, fully expecting it to stop him. The pan started down but his speed was not checked. He looked and saw that the pan had stopped going down.

He was familiar with the fastest speed of a tournapull in gear, which is 22 to 25 miles per hour. He steered the tournapull into the embankment. He had an opinion that his speed at impact with the bank was greater than the fastest speed of a tournapull in gear. He doesn't know if the pan ever dropped sufficiently to take hold. When plaintiff put on his brakes he noted the air pressure was down to 10 pounds and before he pulled into the bank it had gone all the way down. If he had jumped there was a possibility he would have fallen under the wheels or been dragged by the pan. He knew if he went past the truck he couldn't make the curve in the road and he would have gone over the cliff. When he finally came to a stop he was pinned between the tournapull and the truck.

Plaintiff started operating heavy equipment in 1938. He had operated tournapulls between 1949 and 1954 and was a

certified operator of electrically controlled tournapulls. This included a number of other types of road scrapers besides the electric tournapulls. He was familiar with the fact that tournapulls had disc brakes which he knew were air actuated and that a diaphragm was involved in the brake mechanism. He stated he didn't know he could lose all air from one application of brakes or lose all brakes through a rupture of the diaphragm.

Plaintiff stated that the tournapull's brakes worked properly before attempting to stop when he saw the water truck. He knew the tournapull didn't steer as well as the one he had used in the morning and the pan did not raise and lower in response to the electrical controls as fast as in other tournapulls. He had had trouble on previous occasions with the breaker points in the electrical system which actuated the pan and steering mechanism on this tournapull. He had complained about the bad breaker points to his employer's maintenance man but they had not been replaced before the accident.

As noted above the trial court found that defendant Le Tourneau was negligent for failing to design and incorporate in the tournapull an emergency braking system so that the tournapull could be stopped if the primary service braking system should fail instantaneously while the tournapull was proceeding down a steep hill carrying a heavy load of dirt. The court further found that the dropping of the electrically operated pan or scraper was inadequate as an emergency brake.

With respect to defendant Jaehn, the court found that as chief maintenance mechanic of plaintiff's employer, Jaehn negligently failed to inspect, supervise and keep tournapull No. 62 in good repair as to its brakes and electric motors, and as a direct result the said tournapull became unsafe and unsound in its operating condition.

The court then awarded judgment to the defendants on the basis of their affirmative defense of assumption of risk, and found the following:

Plaintiff was a skilled operator of tournapull machines and was familiar with the said Model C tournapull and knew and actually fully appreciated that the tournapull was negligently designed in that the service braking system would from time to time fail instantaneously without warning by reason of the failure of the neoprene diaphragm which was an intricate part of the service braking system. Plaintiff also knew and

fully appreciated that upon the failure of the diaphragm the air pressure would drop instantaneously, causing the service brakes on the tournapull to become inoperative and further causing the gears, which were also air actuated, to become inoperative, thereby causing the tournapull to become a free-wheeling vehicle. Plaintiff further knew and fully appreciated that upon such failure there was no adequate emergency braking system, but plaintiff nevertheless voluntarily exposed himself to the above described dangers. Plaintiff, fully knowing and appreciating the above described risks with freedom of choice, voluntarily exposed himself to those dangers and therefore assumed the risk of operating the machine. Plaintiff further actually knew and fully appreciated that tournapull No. 62 was negligently maintained, that is, that the brake diaphragms were not inspected and changed until they failed, and that the points on the electric motors were negligently maintained, and that this negligent maintenance concurring with the instantaneous failure of the service brakes would place plaintiff in danger of great bodily injury.

The sole question in this appeal is whether there is substantial evidence to support the trial court's finding that plaintiff assumed the risk.

Plaintiff contends that it was error for the trial court to hold that he assumed the risk. He supports this claim with the following arguments:

(1) Actual knowledge of the existence of a specific danger is an indispensable element of the defense of the assumption of risk.

(2) Knowledge of the contractor or fellow employees is not imputable to plaintiff.

(3) Plaintiff has no duty to discover defects.

(4) Plaintiff should recover if he had some knowledge but no understanding or appreciation of its full nature and effect.

Defendants argue that the trial court's finding of assumption of risk was correct. They support their contention with the following claims:

(1) Where facts are such that plaintiff must have had knowledge of the danger it is equivalent of actual knowledge.

(2) Plaintiff cannot deny knowledge as it must have been obvious to him.

(3) Actual knowledge may be inferred from the circumstances.

■ In *Guerrero* v. *Westgate Lumber Co.*, 164 Cal.App. 2d 612 [331 P.2d 107], at p. 618, the court said:

"The affirmative defense of assumption of risk arises only upon a showing that the plaintiff had actual knowledge and appreciation of the existence of a particular danger. As stated in Prosser on Torts, 2d edition, page 203:

" 'The defense of assumption of risk rests upon the plaintiff's consent to relieve the defendant of an obligation of conduct toward him, and to take his chances of harm from a particular risk. . . .

" '. . . In its simplest and primary sense, it means that the plaintiff has given his express consent to relieve the defendant of an obligation of conduct toward him, and to take his chance of injury from a known risk.'

"Actual knowledge of the existence of a specific danger is an essential and indispensable element of the defense of assumption of risk. It is not enough that the plaintiff should have been aware of that danger. There must be evidence sufficient to show that he was *actually* aware of it. (*Prescott* v. *Ralphs Grocery Co.*, 42 Cal.2d 158, 162 [265 P.2d 904]. Further, as stated by this court in *Dutcher* v. *City of Santa Rosa High School Dist.*, 137 Cal.App.2d 481, 484 [290 P.2d 316, 291 P.2d 557]:

" '. . . before the defense of assumed risk can succeed the evidence must disclose either actual or implied knowledge of the risk and an appreciation of the magnitude thereof.' "

■ With respect to knowledge on the part of plaintiff required for the operation of the doctrine of assumption of risk Dean Prosser states:

" 'Knowledge of the risk is the watchword of assumption of risk.' Ordinarily the plaintiff will not be taken to assume any risk of conditions or activities of which he is ignorant. Furthermore, he must not only know of the facts which create the danger, but he must comprehend and appreciate the danger itself.

"At the same time, it is evident that in all such cases an objective standard must be applied, and that the plaintiff cannot be heard to say that he did not comprehend a risk which must have been obvious to him." (Prosser on Torts (2d ed.) pp. 309-310.)

In *Hayes* v. *Richfield Oil Corp.*, 38 Cal.2d 375, 385 [240 P.2d 580], the court cites as a correct statement the rule that ". . . 'before it can be said that one has "assumed the risk" of a specified hazard, it must be shown that he had knowledge of the condition creating the hazard.' "

■ The courts have often recognized that where a person must work in a position of possible danger the amount of care he is bound to exercise for his own safety may well be less by reason of the necessity of his giving attention to his work than would otherwise be the case. (*Austin* v. *Riverside Portland Cement Co.*, 44 Cal.2d 225, 239 [282 P.2d 69]; *Mula* v. *Meyer*, 132 Cal.App.2d 279, 286 [282 P.2d 107]; *Ostertag* v. *Bethlehem Shipbuilding Corp.*, 65 Cal.App.2d 795, 801 [151 P.2d 647].)

■ Furthermore, one who surrenders his better judgment on an assurance of safety or promise of protection does not assume the risk, unless the danger is so obvious and extreme that there can be no reliance on the assurance. (*Fred Harvey Corp.* v. *Mateas*, 170 F.2d 612, 616.)

■ We hold the trial court's finding that plaintiff assumed the risk is not supported by the evidence. An examination of the record indicates that plaintiff did know he was working in a hazardous industry and that he was a skilled operator of and familiar with the Model C tournapull. However, there is no evidence that plaintiff knew of the specific danger which caused his injury. On the contrary, the evidence shows that upon inquiry of the chief mechanic he was assured No. 62 was in "A-1" condition. Plaintiff's tests of air pressure, brakes and electrically operated scraper all showed them to be in working order.

General knowledge that the tournapull is a dangerous machine or that tournapull No. 62 was not properly maintained is not sufficient to conclude that plaintiff knew and voluntarily accepted the risk that when he would attempt to stop the machine descending a steep grade by applying the brakes, an air diaphragm would be likely to burst and the electrically operated pan would be likely to malfunction at the same time, making the loaded tournapull an 80,000-pound free-wheeling vehicle. Neither can it be said from the facts in the instant case that such risk must have been obvious to him. Even applying an objective standard it is not reasonable to conclude from the facts and circumstances of this case that any

tournapull operator would have known and appreciated the specific risk which faced plaintiff here.

The judgment is reversed.

Jefferson, J., and Ford, J.,* concurred.

A petition for a rehearing was denied on February 8, 1963, and the opinion and judgment were modified to read as printed above. A petition for a rehearing was denied February 27, 1963.

*Assigned by Chairman of Judicial Council.